In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2737

AAR International, Incorporated,

Plaintiff-Appellant,

v.

Nimelias Enterprises S.A., Vacances
Heliades S.A. and Princess Airlines S.A.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 99 C 8090--Elaine E. Bucklo, Judge.

Argued December 7, 2000--Decided April 27,
2001

   Before Bauer, Manion, and Rovner, Circuit
Judges.

   Bauer, Circuit Judge.  AAR International,
Inc. ("AAR") appeals from the decision of
the district court granting the
appellees' motion to abstain, stay and/or
dismiss proceedings which AAR had brought
against Vacances Heliades S.A. ("VH").
AAR also asks us to remand the case to
the district court with instructions to
deny VH's alternative motion to dismiss
the action on grounds of forum non
conveniens. For the reasons set forth
below, we reverse and remand.

BACKGROUND

   AAR leased a Boeing 737-3Q8 aircraft to
VH for a term of 96 months pursuant to an
Aircraft Lease Agreement in May of 1998.
Shortly thereafter, VH subleased the
plane to Nimelias Enterprises S.A., who
in turn sub-subleased it to Princess
Airlines. VH and Nimelias have assigned
to AAR their rights under the sublease
and subsublease, respectively. On

November 23, 1998, AAR contracted to sell its rights in the plane, the lease, the sublease, and the subsublease to First Security Bank as owner trustee for the benefit of TA Air X Corp. However, on October 28, 1999, First Security Bank and TA Air X Corp. assigned and transferred back all such rights to AAR.

On August 23, 1999, First Security/1 provided defendants with written notice asserting that they were in default of their obligations under the various lease and sublease agreements in several respects. Specifically, AAR claimed that the defendants had violated the lease by: (1) permitting delinquent EuroControl charges of approximately Euro 700,000 to accrue on the plane;/2 (2) failing to keep the plane in serviceable condition by allowing an engine to be taken off-wing and to remain unserviceable for over one year and by failing to take required steps to enable the engine to be repaired and maintained; and (3) failing to pay variable rent under the lease for July, 1999. As a further response to these alleged acts of default, AAR and First National provided the defendants with written notice of termination of the lease on September 7, 1999.

VH claims that AAR failed to fulfill some of its obligations under the lease before it sent notice of the defendants' alleged default, and that at least one of the actions that AAR characterizes as an act of default was caused by AAR's prior breach. Specifically, AAR notes that the lease obliged AAR to deliver the plane "fresh from a Boeing Maintenance Planning Document C-7 check (overhaul) with all CPCP tasks current and completed."  VH claims that the C-7 overhaul inspection "makes the [a]ircraft airworthy for at least 8,000 flight hours."/3 However, VH claims that the plane's engines began to develop technical problems after about 3,500 flight hours, and that a subsequent maintenance check revealed that one of them was in need of immediate and extensive repairs. VH asserts that it needed certain maintenance records to perform the required repairs, including video boroscopes of the engine which the lease had required AAR to perform before delivering the plane to VH. VH maintains that it contacted TA Air (which was at that time the owner-participant of the plane and of AAR's rights under the

lease) and requested the maintenance records (including the boroscopes), but that the records could not be found. VH claims that after investigating the matter, it concluded that the boroscopes had not been completed. VH claims that it was unable to repair the engine without the required maintenance documents, and was therefore forced to take the engine off-wing and to replace it with a substitute engine, which it had leased from another company at a cost of $700,000. According to VH, TA Air consented in writing to the engine substitution on June 3, 1999. VH sent the original engine to an Israeli company for repairs.

On October 1, 1999, less than one month after First Security and AAR had sent the defendants its notice of termination of the lease, VH filed a complaint before the One Member First Instance Court of Athens, Greece against "AAR Corp.," (AAR's parent company, which AAR insists is a wholly separate legal entity from AAR), Transamerica Equipment Financial Services, and TA Air. VH alleged that AAR and TA Air had breached the lease and caused VH damages by failing to perform required maintenance and by failing to provide VH with the information necessary to repair the engine. VH asserted that the defendants' termination of the lease was "invalid, improper and fraudulent" because: (1) it came from the owner trustee of the aircraft (First Security) rather than from the owner-participant (TA Air); and (2) it was "supported on non-existent and unfounded grounds, which have been created by those who have made the termination." (That is, VH claimed that AAR and TA Air were themselves keeping the engine off-wing, and therefore keeping the plane out of serviceable condition, by refusing to turn over the records needed to make the repairs.) The complaint sought the arrest of AAR's assets in Greece (including the plane)/4 as security for VH's damage claims, an order prohibiting the deregistration and departure of the aircraft from Greece, and the maintenance of the status quo until a hearing on the merits of VH's damage claims.

On October 8, 1999 AAR Corp. and TA Air filed handwritten responses with the Greek court. AAR Corp. denied that the arrest of its assets and of the aircraft

was necessary, arguing that it was a publically traded corporation with significant assets, and that therefore VH was exposed to no financial risk. AAR Corp. also argued that it should be free of any legal liability because AAR's rights in the lease were assigned to TA Air at the time that the engine failure occurred, and because the contract expressly provided that the plane was leased "as is" with no warranty. On October 11, 1999 the Athens court issued a brief handwritten provisional order prohibiting the deregistration and departure of the plane pending a subsequent hearing, which was set for November 11, 1999. At the November 11 hearing, counsel for the parties appeared and presented arguments. AAR claims that during the hearing, its local counsel orally argued that AAR was a separate entity from AAR Corp., that only the former was a party to the lease, and that VH had therefore named the wrong party in its complaint. On November 15, 1999, the court reaffirmed and extended the October 11th provisional order pending a final decision on the merits. On November 15, TA Air filed a written objection to the November 11 order, in which it argued that AAR, Corp. and AAR International, Inc. were separate entities. On October 28, 1999 TA Air transferred back its interest in the plane and the lease to AAR.

On November 22, VH filed a second action against "AAR, International Inc. Corp." and TA Air in the Multi Member First Instance Court in Athens (the "second Athens action"). This time, VH sought substantial damages for costs arising out of the failure of the original engine. Specifically, VH claimed $3.9 million to cover the cost of leasing a replacement engine, plus approximately $200,000 to cover late fees and a lost security deposit in connection with that leasing. VH's theory of recovery in the second Athens action was that AAR breached the lease by failing to perform the required video boroscopes on the engine before delivery, by failing to deliver the engine in working condition for 8,000 flight hours, and by failing to provide VH with the maintenance records necessary to repair the original engine. The damages sought covered the period from the filing of the first action on October 1, 1999 to the date of the filing of the

second action. The Greek court set a court date for December 14, 2000. The parties dispute what was to occur on this date; VH claims that the case was "set for trial" on that date, while AAR contends (through the affidavit of its Greek attorney) that the December 14 date was for a preliminary hearing only, that no witness examination or discovery was scheduled to occur until after that date, and that no trial would likely occur for several years.

On December 13, AAR filed suit against VH, Nimelias, and Princess (the "appellees") in the Northern District of Illinois, seeking damages for the defendants' breach of the lease. The asserted grounds for the suit were identical to those stated in the written notice of default (namely, that the appellees had allowed the engine to go off-wing, that they had allowed EuroControl liens to accrue, and that they had failed to pay variable rent on the plane for July, 1999.) The complaint asserted that these acts of default justified AAR in terminating the lease in September, 1999. AAR sought damages in excess of $21 million to cover costs of returning the plane or of any engine to the United States, and of restoring the plane to airworthy condition. AAR also sought reimbursement for the EuroControl charges that it claimed it was forced to pay on Princess' behalf.

On January 25, 2000 the Athens court issued a written decision in the first Athens action under the title "Provisory Measures Procedure." After concluding that Greek law applied to the action, the court found several facts to be "probable" in light of its consideration of witness testimony, oral arguments, documents, and written submissions presented by the parties during the November 11 hearing. For example, the court found it probable that AAR Corp. and AAR are the same legal person, and that AAR Corp. failed to deliver the aircraft with its engines properly maintained, forcing VH to lease a replacement engine in order to continue operating the aircraft, thereby incurring expenses of 221,000.000 Greek Drachmae. The court also found that the aircraft appeared to be AAR Corp.'s "sole negotiable asset," and that the situation regarding AAR Corp.'s assets was

"doubtful, creating a financial risk for [VH] as per the satisfaction of its requirements." The court then held that these provisional findings supported VH's requested "safety measure of conservatory seizure for 221,000 Grd against [AAR Corp.]" plus an additional 29,000 Grd in interest and fees. The court then ordered "the conservatory seizure of any movable or real estate of [AAR Corp.]" and of the aircraft "in order to ensure [VH]'s claim against [it] . . . up to the amount of 250,000 Grd." The court also expressly allowed AAR Corp. to cancel (or if the seizure had already been enforced, to replace) the seizure by providing the Court's Secretarial Service with a bank guarantee in the form of an irrevocable line of credit in the same amount from a creditable bank operating in Greece./5

The parties provide differing characterizations of the purpose and effect of the first Athens action. VH describes the first Athens action as an emergency action seeking the seizure (or arrest) of the aircraft to guarantee that there would be assets available to satisfy a judgment that VH may obtain against AAR, and seeking an assessment of those damages. VH asserts that the "findings" made by the Athens court on January 25 are not provisional, and in support of this proposition it provides an affidavit of its Greek attorney which states that it is extremely rare where the Multimember First Instance Court of Athens will overturn the findings of the Emergency Court. Conversely, AAR presents the testimony of its own Greek attorney, who states by affidavit that under applicable Greek law and procedure, the First Athens action was provisional in nature, and nothing adjudicated therein constitutes a finding of fact or law for any purpose. Further, he asserts that the order entered by the Athens court on October 11, 1999 was meant only to protect the status quo ante until hearing on the petition, and that the November 11 order likewise only maintained in effect the prior order pending a judgment. Furthermore, AAR's Greek lawyer states that the Greek court did not need to have personal jurisdiction over any of the defendants in order to issue such provisional relief, and that no ruling in the first Athens action operates as a finding that the Athens court has jurisdiction over the defendants or that

such defendants have been formally served with process (other than by telegram). Finally, he asserts that the January 25, 2000 order in the first Athens action constituted only a temporary arrest (or attachment) of the aircraft and a provisional order prohibiting the deregistration and departure of the Aircraft pending the final resolution of VH's claims.

Subsequently, VH instituted two additional related actions in the Greek courts. After AAR posted the bank guarantee and attempted to remove the plane from Greece on February 4, 2000, VH filed another emergency proceeding (the "third Athens action"). Like the first action, this action sought the immediate seizure of the aircraft as well as a prohibition against the deregistration and departure of the plane until a final and unappealable decision is issued (and in any case until the engine is repaired). It also sought the attachment of all of "AAR International Corp."'s assets in Greece, and a provisional order prohibiting the deregistration or take-off of the aircraft, as well as any other action which might change the actual and legal status of the plane and or any other assets of the defendant. The purpose of this action was to secure potential recovery under the second Athens action, that is, it was a request for temporary relief pending the outcome of that action in order to ensure that "AAR International Corp." had sufficient assets available to cover any potential damages awarded against it in the second action.

On February 7, 2000, the Athens Court granted VH the relief it sought in the third action, and again ordered the seizure of the aircraft and provisionally prohibited its deregistration or departure. Once again, the court provided that the plane would be allowed to be deregistered and removed from Greece if AAR posted a bank guarantee in the amount of 250,000 Grd. AAR posted the bank guarantee shortly thereafter, and removed the plane from Greece. In addition, VH filed a fourth action in Athens, which it describes as a continuation or renewal of the first Athens action. VH claims that, under Greek law, it was obliged to file the fourth, "non-emergency" action in order to recover any damages from AAR and

to maintain in force all of the orders and decisions given according to the emergency procedure. VH asserts that the fourth Athens action is "exactly the same case" as the first Athens action, except that it is filed according to "ordinary" or "non-emergency" procedures.

In the federal action, the appellees moved the district court to abstain under the Colorado River doctrine in light of the pending Greek actions, or in the alternative, to dismiss the action on grounds of forum non conveniens. Finding that the American action was parallel to the ongoing Greek litigation and that the Colorado River factors favored abstention, the district court granted the appellees' motion to abstain. The court did not address the forum non conveniens issue. AAR appealed.

DISCUSSION

  A)  Abstention

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred on them by Congress. Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 817 (1976).  Nevertheless, in "exceptional" circumstances, a federal court may abstain from hearing a suit and "await the outcome of parallel proceedings as a matter of 'wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation.'" Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898 (7th Cir. 1999) (quoting Colorado River, 424 U.S. at 817). However, because the federal courts have a "heavy obligation" to exercise jurisdiction, "only the clearest of justifications will warrant dismissal" of the federal action in deference to a concurrent state proceeding in the name of wise judicial administration Colorado River, 424 U.S. at 819, 820. Therefore, our task in determining whether abstention is appropriate is "not to find some substantial reason for the exercise of federal jurisdiction by the district court, . . . [but] rather . . . toascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under Colorado River to justify the surrender of that jurisdiction."

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983). We review a district court's decision to abstain under Colorado River for abuse of discretion. See Finova, 180 F.3d at 898. However, to avoid reversal, a district court must exercise its discretion under the standards prescribed by Colorado River. That is, it must consider the factors listed in Colorado River and its progeny and determine whether in light of those factors exceptional circumstances exist warranting abstention. See Moses H. Cone Mem'l Hosp., 460 U.S. at 19. If there is any substantial doubt that the parallel litigation will be "an adequate vehicle for the complete and prompt resolution of the issues between the parties," it would be a "serious abuse of discretion" for the district court to stay or dismiss a case in deference to the parallel litigation. Id. at 28. Moreover, while the situation confronting a court on a motion to abstain "is somewhat different where, as here, the alternate forum is not the tribunal of a state of the federal union to which, under our Constitution, we owe a special obligation of comity," we apply the same general principles with respect to parallel proceedings in a foreign court in the interests of international comity. Finova, 180 F.3d at 898 (citing Ingersoll Milling Mach. Co. v. Granger, 833 F.2d 680, 685 (7th Cir. 1987) (internal quotation omitted)).

In evaluating the propriety of the district court's decision to abstain under Colorado River, we must first determine whether the federal and foreign proceedings are parallel. See Finova, 180 F.3d at 898 (citing Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698 (7th Cir. 1992)). This is a legal issue which we review de novo. See Property & Cas. Ins. Ltd. v. Central Nat'l Ins. Co. of Omaha, 936 F.2d 319, 321 (7th Cir. 1991) (citations omitted); Ryan v. Johnson, 115 F.3d 193, 196 (3d Cir. 1997) (citation omitted). If the actions are not parallel, the Colorado River doctrine does not apply. See Interstate Material Corp. v. City of Chicago, 847 F.2d 1285, 1287 (7th Cir. 1988). Suits are parallel if "substantially the same parties are litigating substantially the same issues simultaneously in two fora." Schneider Nat'l Carriers, Inc. v. Carr, 903 F.2d

1154, 1156 (7th Cir. 1990). Suits need not be identical to be parallel, see Caminiti, 962 F.2d at 700, and the mere presence of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel. See id. at 701; Lumen Constr., Inc. v. Brant Constr. Co., Inc., 780 F.2d 691, 695 (7th Cir. 1985). The question is not whether the suits are formally symmetrical, but whether there is a "sub stantial likelihood" that the foreign litigation "will dispose of all claims presented in the federal case." Day v. Union Mines Inc., 862 F.2d 652, 656 (7th Cir. 1988) (quoting Lumen, 780 F.2d at 695).

The district court found that the federal action and the Greek actions were parallel. The court reasoned that:

[t]here is a substantial likelihood that [the Greek] cases will dispose of all the issues in the federal litigation because a single member of the Greek court, which normally sits as a panel of three, has found on an emergency hearing that AAR is liable to the defendants here (overlapping with some of the plaintiffs there) and has ruled in a preliminary way on damages.

The court also found that AAR had offered "no plausible reason to think that this ruling will be reversed by the full panel," and stated that "if there will be anything more to litigate in this matter than liability and damages, AAR does not explain what it is." Finally, the district court concluded that if the ruling of the Greek judge is upheld, "that would probably end the matter," because the ruling would be entitled to recognition and would have preclusive effects over the claims brought in the federal action.

AAR challenges the district court's finding on several grounds/6, but we can resolve the matter by addressing only one. AAR maintains that the claims that it brought in the federal case are distinct from and independent of the claims brought in the second Athens action, and that therefore it is unlikely that the second Athens action will dispose of them. In support of this argument, AAR points to section 1E of the lease, which provides in relevant part:

Lessee will pay all Base Rental, Variable Rental, Supplemental Rental, costs, charges, fees and expenses in connection with the use, possession and operation of the Aircraft, including maintenance, insurance, state, local, provincial and all other taxes, and risk of loss or other casualty. Such obligations of Lessee will be paid in full and will be absolute and unconditional under any and all circumstances and regardless of other events, including any of the following: (a) Any right of set-off, counterclaim, recoupment, defense or other right (including any right of reimbursement) which Lessee may have against Lessor . . . including any claim Lessee may have for the foregoing. (b) Unavailability or interruption in the use of the Aircraft for any reason, including . . . any defect in airworthiness, merchantability, fitness for any purpose, fitness, design . . . . (d) Invalidity or unenforceability . . . or other defect in this Lease. (e) Failure or delay on the part of any party to perform its obligations under this Lease. (f) Other cause which but for this provision would or might have the effect of terminating or in any other way affecting any obligation of Lessee hereunder.

AAR urges that, according to this provision of the lease, the appellees' obligation to pay rent, to keep the aircraft in operational condition, and to discharge any liens against the aircraft--which is the focus of the federal claim--is absolute and unconditional, and is not subject to any claims and defenses that VH may have against AAR. AAR notes that VH's obligations under this provision were not and are not at issue in any of the Greek actions, and that therefore no ruling in those actions could have preclusive effect over AAR's claims in the federal action. Therefore, AAR argues that even if the Athens court has ruled in a preliminary fashion that AAR is liable to VH for damages resulting from the failure of the engine, it has not ruled that this breach by AAR excused the defendants from their independent duties. Indeed, AAR maintains that any such finding would flatly contradict the terms of section 1E of the lease.

We agree with AAR. On the facts presented, it does not seem substantially

likely that the Greek actions will dispose of all of the claims presented in the federal suit. It is quite possible that AAR's claim that the appellees breached the lease by taking the engine off-wing will be disposed of in the Greek action, as such a claim would be precluded by a final judgment by the Greek court that AAR breached the contract and forced VH to remove the engine when it leased the aircraft with a defective engine./7 However, AAR's other claims are not currently before the Greek courts in any of the Greek actions, and it does not seem likely that any of the Greek courts will resolve the legal and factual issues supporting those claims in deciding the claims actually before them. The only lease-based defense that AAR has put forward in any of the Greek actions is that under a separate section of the lease, the aircraft was leased on an "as is" basis with no warranties of any kind. It has not injected the issue of the interpretation of section 1E into any of the Greek litigation by way of either a defense or a counterclaim. Nor has AAR alleged in any of the Greek actions that the appellees failed to pay rent or to discharge any liens, or that the appellees had a duty to pay such expenses irrespective of any alleged breach on AAR's part. Neither AAR nor any of the appellees have sought a declaration of their rights under section 1E in any of the Greek actions. Therefore, even if the provisional rulings in the first and third Athens actions are upheld on appeal and VH prevails in the second Athens action as well, the appellees' obligations and potential liability under section 1E of the lease for failing to pay rent and to keep the aircraft free of liens will not have been decided. While we do not decide the issue and interpret section 1E, we cannot find AAR's argument that section 1E makes the appellees' duty to pay rent and to discharge liens absolute irrespective of any breach by AAR implausible as a matter of law. Given this, we cannot say that it is substantially likely that the issue will be disposed of in the Greek litigation. Because "[i]t would be a serious abuse of discretion" to abstain under Colorado River if "there is any substantial doubt" "that the parallel . . . litigation will be an adequate vehicle for the complete . . . resolution of the issues between the parties," Moses H. Cone Mem'l Hosp., 460

U.S. at 28, and because any doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction, see Allen v. Board of Educ., Unified Sch. Dist. 436, 68 F.3d 401, 403 (10th Cir. 1995), we conclude that the federal and foreign actions are not parallel.

None of this is meant to signal a retreat from our holding in Day. In that case, we found that a claim brought in federal court by a group of former shareholders against the purchasers of their stock was parallel for Colorado River purposes to a pending state court action involving essentially the same parties, where the federal action turned on the interpretation of the payment provision of the stock purchase agreement which was the subject of the state litigation. Day v. Union Mines, Inc., 862 F.2d 652, 655-57 (7th Cir. 1988). We found the federal and state suits to be parallel even though the particular issue presented in the federal claim--the interpretation of the payment provision of the stock purchase agreement--was not specifically raised in the state court proceeding.  In the state action, the purchasers of the stock had claimed that the shareholders breached certain representations and warranties, thereby relieving the purchasers of their obligations under the stock purchase agreement. The state action therefore addressed the validity, enforceability, and interpretation of the entire stock purchase agreement, of which the payment provision was a part. Under these circumstances, we agreed with the district court's conclusion that the issue presented in the federal claim would be disposed of in the state litigation, regardless of which party prevailed in the state case. See id. at 656. We reasoned that if the purchasers won the state case, then the purchase agreement would be declared invalid in toto, and the shareholders would be left unable to enforce its payment provision against the purchasers. We further surmised that if the shareholders won the state case, then this would constitute a finding by the state court that they were entitled to payment, and the state court would almost inevitably have to interpret the payment provision in order to determine the amount of payment that they could collect. Given this, we concluded

that the issue presented in the federal action was premature, since it could not be resolved until the issue presented in the state action (the validity of the stock purchase agreement) was decided. Therefore, we found that the federal and state actions were parallel, and we ruled that "[w]here the validity, enforceability and interpretation of a contract are at issue in both federal and state courts, and the state litigation was commenced first and has progressed substantially towards completion, entry of a stay does not under Colorado River constitute an abuse of discretion." Id.

We find this case to be distinguishable from Day. VH has not argued in any of the Greek actions that AAR's claimed breach invalidated the lease or excused VH from its lease obligations to pay rent and discharge liens against the aircraft. Rather, it seeks to hold AAR liable for breaching certain claimed warranties which would not necessarily implicate its own obligations under section 1E of the lease. Therefore, it is possible that VH could prevail in the Greek action without defeating all of AAR's claims in the federal action. In addition, it is not necessarily the case that the issue presented by VH in the foreign action must be resolved before the district court can rule on the claim presented in the federal action. While actions filed in separate fora alleging breaches of different provisions of the same contract may frequently be deemed parallel for Colorado River purposes, see generally Evans Transp. Co. v. Scullin Steel Co., 693 F.2d 715 (7th Cir. 1982); Microsoftware Computer Sys., Inc. v. Ontel Corp., 686 F.2d 531 (7th Cir. 1982) (overruled on other grounds by Gulf Stream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 27 (1988)); Darsie v. Avia Group Int'l, Inc., 36 F.3d 743 (8th Cir. 1994); Manley, Inc. v. Keystone Food Prods., Inc., 859 F.2d 80 (8th Cir. 1988), the presence of section 1E of the lease prevents us from drawing such a conclusion here.

Citing Channell v. Citicorp Nat'l Services, Inc., 89 F.3d 379 (7th Cir. 1996), the appellees seem to argue that the Greek actions are parallel to the federal action because the claim brought by AAR in the federal action arises from the same "operative facts" as the claims

brought in Greece, and therefore should have been pled as a compulsory counterclaim in the Greek actions. However, Channell addressed the scope of a district court's authority under 28 U.S.C. sec. 1367 to exercise supplemental jurisdiction over claims that form part of the same "case or controversy" under Article III of the Constitution, and not the standards for determining whether actions are parallel for purposes of Colorado River abstention. Channell is therefore inapplicable here. Moreover, in concluding that an automobile lessor's counterclaim seeking contractual termination payments against lessees who had brought an action for violation of the Consumer Leasing Act was sufficiently connected to the lessees' claims (under sec. 1367's liberal standards) to allow the court to assert jurisdiction over the counterclaims, we were careful in Channell to note that the lessees' claims and the lessor's counterclaims were based on the same clause of the lease, and that the basic issues were integral to the lessees' case even before the counterclaim was brought. See id. at 385–86. As has been noted, AAR's federal claim does not bear a similar relationship to the Greek claims.

Nevertheless, it could be argued that a claim brought in a federal action based on a claim which would be a compulsory counterclaim in a pending foreign action might make the federal action "parallel" to the foreign action, because the federal claim would be "disposed of" in the foreign action in one way or another. (That is, it would either be asserted as a counterclaim in the foreign action and decided there, or lost if not asserted before the conclusion of the foreign action. Either way, conclusion of the foreign litigation would leave nothing left for the federal court to decide.) However, the appellees point to no authority (nor have we found any) suggesting that a federal action is parallel to a state or foreign action for Colorado River abstention purposes when the claim upon which the federal action is based is pleadable as a compulsory counterclaim in the other action. Moreover, it is unclear that Greece has a compulsory counterclaim rule analogous to Fed. R. Civ. P. 13(a). VH submitted the affidavit of its Greek lawyer, which states that Greek law provides for the

filing of counterclaims either in the original action or in a separate procedure, and that "[i]f a party choose [sic] the way of separate procedure," then the Greek court has the power to unify the claim with the original procedure. Moreover, the affidavit states that "[c]laims not asserted in any of the current proceedings or not presented on time even in a separate procedure (which will be unified with the existing procedures as . . . mentioned above[)] . . . or before the current proceedings are concluded, will be lost."/8 From the affidavit, it is not clear whether a Greek court's "unifying" of counterclaims brought in separate proceedings with the original proceeding is mandatory or discretionary. Thus it is not clear that counterclaims neither filed in the original action nor unified with that action before the decision is reached will be "lost."

In addition, even if we were to conclude that either of the Greek actions were parallel to the federal action, we would not affirm the district court's decision to abstain in this case. Once a district court determines that the federal action and the foreign action are parallel, its next task is "to balance the considerations that weigh in favor of, and against, abstention, bearing in mind the exceptional nature of the measure." Finova, 180 F.3d at 898. One of the ten factors that the court must consider is the relative inconvenience of the federal forum. See id. In considering this factor, the district court placed undue weight on the inconvenience of the federal forum for the appellees, and did not adequately consider the inconvenience of the Greek forum for AAR. The court took judicial notice that the law firm representing AAR "advertises itself as a global law firm . . . and is presumably able to litigate even in Athens." Putting aside the district court's rather unorthodox use of judicial notice, we find that the court erred in considering the law firm's ability to litigate in Athens as part of the "convenience" calculus. The proper inquiry is the relative inconvenience of the competing fora to the parties, not to their lawyers. Moreover, the district court did not even consider section 20B of the Lease, which provides that the appellees "irrevocably consent" to non-exclusive

jurisdiction in Illinois and "irrevocably waiv[e] any claim that any such suit, action or proceeding brought in any court in or of the State of Illinois has been brought in an inconvenient forum." While we reject AAR's argument that section 20B bars VH's entire abstention claim (because an abstention motion is not the same as an objection to venue on grounds of inconvenience, and inconvenience to the parties is only one of the many factors that a district court weighs in deciding whether to abstain), we do find that this provision of the lease is relevant to the convenience analysis and should have been weighed by the court. The court should have determined whether section 20B precluded the defendants from objecting to the inconvenience of venue in Illinois altogether, therefore ceding the inconvenience factor of the abstention analysis to AAR. At the very least, this error would require us to remand to the district court for reconsideration, even if we found the Greek and the federal litigation parallel.

## B) Forum non conveniens

AAR also asks us to remand this case to the district court with instructions to deny VH's motion to dismiss the federal action on grounds of forum non conveniens. The appellees brought their forum non conveniens motion before the district court as an alternative to their abstention motion, but the district court did not address it, presumably deeming it mooted by its decision to abstain the action. AAR now asks us to decide the merits of the motion in its favor. The appellees object that because the district court did not rule on this matter, there is nothing for us to review.

As a general rule, an appellate court may not consider an issue not passed on below. See Singleton v. Wulff, 428 U.S. 106, 120 (1976). However, this rule is subject to certain limited exceptions. For example, an appellate court may resolve an issue not decided by the district court where "the proper resolution [of that issue] is beyond any doubt." See id. at 121 (citing Turner v. City of Memphis, 369 U.S. 350 (1962)). "The matter of what questions may be

taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton, 428 U.S. at 120. In exercising this discretion, we have resolved issues which were not resolved below where, inter alia, "both parties have briefed and argued [the issue's] merits," and where "the benefit of a district court hearing is minimal because proper resolution of the issue is clear." United States v. Brown, 739 F.2d 1136, 1145 (7th Cir. 1984). See also Otto v. Variable Annuity Life Ins. Co., 814 F.2d 1127, 1137-38 (7th Cir. 1986) (deciding a summary judgment motion raised below but not reached by the district court "in the interests of judicial economy," where the parties had a "full and fair opportunity to argue all relevant aspects of the . . . issue" before both the district and the appellate courts, and where the correct resolution of the issue was clear).

AAR argues that the proper resolution of this issue is beyond any doubt (therefore making it a candidate for resolution on appeal) because section 20B of the lease provides that the appellees irrevocably consent to the non-exclusive jurisdiction of the Illinois federal and state courts, and irrevocably waive any objection to the venue of any action brought in Illinois as well as any objection that any such action has been brought in an inconvenient forum. AAR notes that we have held that when parties freely negotiate a forum selection clause, the clause is to be enforced in accordance with its terms except in exceptional circumstances, see Bonny v. Society of Lloyd's, 3 F.3d 159-61 (7th Cir. 1993), and that the appellees have identified no such circumstances here. The appellees counter that, while they do not dispute the enforceabilty of section 20B's forum-selection clause, such clauses are not dispositive of a court's decision to grant or deny a motion to dismiss based on forum non conveniens. Citing Comedy Partners v. Street Players Holding Corp., 34 F.Supp.2d 194, 197 (S.D.N.Y. 1999) and Finova, the appellees contend that courts entertaining such motions may properly weigh concerns such as systematic integrity, judicial economy and comity, and are not bound by any agreement between the parties not to object to venue on grounds of inconvenience.

Moreover, the appellees note that the forum selection clause at issue in this case provides for concurrent, non-exclusive jurisdiction in Illinois state and federal courts, and therefore by its terms does not purport to make Illinois the mandatory or exclusive forum for adjudicating disputes over the contract. Therefore, even if the existence of a mandatory forum selection clause were wholly dispositive of the issue (which the appellees deny), this rule would be of no help to AAR.

Before we can determine whether the resolution of this issue is sufficiently clear to permit us to decide it instead of remanding it, we need to determine what legal standards govern a court's analysis of a motion to dismiss on forum non conveniens grounds when the parties have agreed to a forum selection clause like the one in this case. The usual forum non conveniens analysis (that is, the analysis applicable to cases not involving forum selection clauses) consists of a two-step inquiry. The court must first determine that an adequate alternative forum is available to hear the case, meaning that all parties are within the jurisdiction of the alternative forum and amenable to process there, and that the parties would not be treated unfairly or deprived of all remedies if the case were litigated in the alternative forum. See Kamel v. Hill-Rom Co., Inc., 108 F.3d 799, 802-03 (7th Cir. 1997). If the court finds that such an adequate alternative forum exists, then the court must proceed to weigh a host of private interest factors (for example, the "relative ease of access to sources of proof" in each forum, and "the availability of compulsory process for the attendance of unwilling witnesses"), and public interest factors (for example, "administrative difficulties stemming from court congestion," and the interest of trying a diversity case in a forum that is "at home with the law that must govern the action.") Id. at 803. Moreover, under the usual analysis, there is "a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." See Macedo v. Boeing Co., 693 F.2d 683, 688 (7th Cir. 1982) (citations omitted), and this is particularly true where a

domestic plaintiff has filed suit in his own home forum. See id.; see also Kamel, 108 F.3d at 803.

However, some of our sister circuits have suggested that where the parties to an international dispute have agreed to a mandatory forum selection clause, the usual forum non conveniens analysis no longer applies, and the only question remaining for the district court to determine is whether the forum selection clause is enforceable under the standards set forth in Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972). See Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V., 145 F.3d 505, 509-10 (2d Cir. 1998) (suggesting that a district court should first apply the Bremen standards to determine whether the forum selection clause was enforceable, and should only reach the defendant's motion to dismiss on forum non conveniens grounds if it finds that the parties did not form a contract containing a forum selection clause); Cf. Mitsui & Co. (USA), Inc. v. Mira M/V, 111 F.3d 33, 37 (5th Cir. 1997) (rejecting appellant's challenge to the enforcement of a mandatory forum selection clause for reasons of forum non conveniens, and stating that "increased cost and inconvenience are insufficient reasons to invalidate foreign forum-selection or arbitration clauses."); but see Royal Bed & Spring Co., Inc. v. Famossul Industria e Comercio de Moveis LTDA., 906 F.2d 45, 51 (1st Cir. 1990) (ruling that a forum selection provision is not dispositive of a motion to dismiss on forum non conveniens grounds, but rather is "simply one of the factors that should be considered and balanced" in the ordinary forum non conveniens analysis.) In Bremen, the Court ruled that a freely negotiated mandatory forum selection clause is enforceable unless the party challenging its enforcement can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching," or that "trial in the [chosen] forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court."/9 Applying these standards together with standards articulated in later Supreme Court cases, we have ruled that a forum selection clause is presumptively valid and enforceable

unless (1) "[its] incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power; (2) the selected forum is so gravely difficult and inconvenient that [the complaining party] will for all practical purposes be deprived of its day in court; or (3) [its] enforcement . . . would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision." Bonny, 3 F.3d at 160 (internal citations and quotation omitted).

Nevertheless, it can be argued that the Bremen and Bonny standards should not control in this case, for as VH notes, the forum selection clause in the Lease agreement is permissive, not mandatory. (That is, it provides that suit may be brought in Illinois as well as in other jurisdictions, but does not mandate that suit must be brought exclusively in Illinois.) At least one circuit has held that the traditional forum non conveniens analysis (rather than the stricter scrutiny required by Bremen) applies in cases involving permissive forum selection clauses. See Blanco v. Banco Industrial de Venezuela, S.A., 997 F.2d 974, 979-80 (2d Cir. 1993). This conclusion seems reasonable. However, in this case we have more than merely a permissive forum selection clause; we have such a clause plus unambiguous language providing that the lessee shall not object to venue in an Illinois state or federal court on the ground that such a court is an inconvenient forum. We have held that by agreeing to a mandatory forum selection agreement, a party waives objections to venue in the chosen forum on the basis of cost or inconvenience to itself. See Northwestern Int'l, 916 F.2d at 375, 378 (7th Cir. 1990). It would seem incongruous to conclude that a party does not similarly waive such objections when he agrees to a permissive forum selection clause which specifically provides for the waiver of convenience-based objections to suits brought in a particular venue. See generally Blanco, 997 F.2d at 979 (deciding to apply the traditional forum non conveniens analysis rather than the Bremen standards where the forum selection clause at issue was permissive and did not include either the defendant's irrevocable consent to suit in designated fora or the defendant's waiver of forum non conveniens

objections). The forum selection clause and the waiver provisions at issue here were part of a lease that was freely negotiated between sophisticated international corporations. Whatever inconvenience VH would suffer by being forced to litigate in a court in Illinois was foreseeable at the time that it agreed to waive objections based on such factors. See Bremen, 407 U.S. at 17-18. Under these circumstances, we conclude that the stricter standards announced in Bremen and Northwestern Int'l should control the analysis of the appellees' forum non conveniens motion./10

Therefore, the appellees' forum non conveniens motion must fail unless they can demonstrate one of the three factors set forth in Bonny. This they cannot do, because they have effectively conceded the enforceability of the lease's forum selection clause. When confronted with AAR's argument that the forum selection clause and its waiver provisions should control the disposition of its forum non conveniens motion, the appellees argued only that cases like Bonny are inapposite, that the forum selection clause was permissive rather than mandatory, and that contractual agreements not to object to venue on grounds of convenience are not dispositive of forum non conveniens motions. Although AAR cited Bonny and argued that the appellees had not established that any of its three factors were present in this case, the appellees merely asserted that Bonny was inapplicable and did not argue in the alternative that the forum selection clause and its waiver provisions were unenforceable under Bonny. In effect, the appellees have premised their entire argument regarding forum non conveniens on the assumption that the standards set forth in Bonny and Bremen do not control the forum non conveniens inquiry in this case. We have rejected that assumption, and unfortunately for the appellees, they have waived any argument that the forum selection clause is unenforceable.

Therefore, since the forum non conveniens issue was fully briefed by both of the parties on appeal, the resolution of the issue is clear, and the dispositive issue (the enforceability of the forum selection clause) is a question of law which we review de novo, see

Bonny, 3 F.3d at 159 (citations omitted), we conclude that nothing would be gained by remanding this issue to the district court for further consideration. See Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 749-50 (7th Cir. 1993); Bruneau v. FDIC, 981 F.2d 175, 178-79 (5th Cir. 1992). Accordingly, we hold that appellee's motion to dismiss on grounds of forum non conveniens should be denied.

CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision to abstain and REMAND with instructions to vacate the dismissal order and to deny the appellees' motion to dismiss on grounds of forum non conveniens.

REVERSED and REMANDED.

/1 AAR claims that it sent this notice together with First Security, but VH claims that First Security sent it with a carbon copy to TA Air but that the notice "on its face does not appear to have been communicated to AAR." However, VH does state that the later notice of termination of lease was sent by First Security and signed by a representative of AAR.

/2 EuroControl is the European Organization for the Safety of Air Navigation. AAR claims that, by November 4, 1999, EuroControl had asserted a lien against the plane to secure unpaid EuroControl route charges plus interest in the amount of Euro 1,284,606,22 and had sued Princess to recover this amount. AAR also asserts that it paid EuroControl in order to recover possession of the plane, to discharge the lien, and to terminate litigation over the lien, and that the defendants have refused to reimburse AAR for the payment.

/3 This contention is hotly disputed by AAR, which notes that the lease expressly provides that the plane was leased in an "as is" condition and that VH bore the risk of any mechanical problems with the plane, including the engine. AAR contends that such agreements are the standard custom and practice in the aircraft leasing industry. While AAR concedes that the leased obliged it to deliver the plane "fresh from a C-7 inspection," it denies that this obligation included a warranty that the aircraft would remain airworthy for any specified period of time (much less 8,000 flight hours), or that the engine would not develop mechanical problems before any specified number

of flight hours. Indeed, AAR claims that the C-7 inspection was strictly an airframe inspection which did not entail any examination or warranty of the engines.

/4 VH claims that it sought the arrest of AAR's assets in Greece and of the aircraft as security for its claims for damages stemming from AAR's alleged breach of the Lease. AAR disputes this characterization.

/5 The court also found that VH's claims against the other defendants (Transamerica and TA Air) "do not appear to be proven."

/6 For example, AAR argues that it was not a party to any of the Greek actions, and that therefore those actions are not parallel to the federal action. While we do not decide the issue, we assume throughout the opinion that AAR was a party to the Greek litigation.

/7 Even this is uncertain, however. Because, if AAR prevails in the Greek actions, its claims against the appellees will not be resolved.

/8 AAR's Greek lawyer submitted an affidavit denying that Greece has a compulsory counterclaim rule.

/9 We have also noted that "the only good reason for treating a forum selection clause differently from any other contract . . . is the possibility of adverse effects on third parties," and have ruled that where that possibility is slight, it should be treated like any other contract, North-western Nat'l. Ins. Co. v. Donovan, 916 F.2d 372, 376 (7th Cir. 1990), and should therefore be enforced "unless it is subject to any of the sorts of infirmity, such as fraud and mistake, that justify a court's refusing to enforce a contract." Id. at 375.

/10 The appellees rely on Comedy Partners for the proposition that a permissive forum selection clause containing irrevocable consent to suit in a particular forum plus a waiver of forum noncon-veniens objections is not "binding on the court" and is not dispositive of a forum non conveniens motion. However, Comedy Partners did not involve a motion to dismiss on grounds of forum non conveniens. Rather, it involved a motion to dismiss pursuant to the "first filed rule," which is more analogous to an abstention motion than a forum non conveniens motion. As we have noted, a contractual agreement not to object to the incon-venience of a particular venue is not dispositive of an abstention motion. Moreover, the statements in Comedy Partners regarding the effect of a contractual agreement not to object to venue upon a motion to dismiss the action in deference to an

earlier filed suit is dicta. The court actually
held that the party challenging the dismissal
could not rely on the alleged contractual agree-
ment not to object to venue, because its substan-
tive claim was premised on a denial that the
contract existed in the first place.