NOT FOR PUBLICATION[1]

**FILED**
U.S. Bankruptcy
Appellate Panel of the
Tenth Circuit

**July 24, 2020**

**Blaine F. Bates**
**Clerk**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE TENTH CIRCUIT

_____

IN RE THE ASPEN CLUB & SPA, LLC,

Debtor.

IN RE ASPEN CLUB
REDEVELOPMENT COMPANY, LLC,

Debtor.

_____

GPIF ASPEN CLUB LLC,

Appellant,

v.

THE ASPEN CLUB & SPA, LLC and
ASPEN CLUB REDEVELOPMENT
COMPANY, LLC,

Appellees.

BAP No. CO-19-043

Bankr. No. 19-14158
Chapter 11

OPINION

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado

_____

Before **MICHAEL**, **SOMERS**, and **JACOBVITZ**, Bankruptcy Judges.

_____

**JACOBVITZ**, Bankruptcy Judge.

---

[1]   This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion.  10th Cir. BAP L.R. 8026-6.

_____

GPIF Aspen Club, LLC ("GPIF") appeals the Bankruptcy Court's order denying its motion for relief from the automatic stay under 11 U.S.C. § 362(d)(3),[2] applicable to cases in which the bankruptcy estate consists of single asset real estate ("SARE"). In denying stay relief, the Bankruptcy Court erred by not deciding whether the proposed priming lien exit financing feature of Debtors' chapter 11 plan precluded confirmation of the plan such that the plan did not have a reasonable possibility of being confirmed within a reasonable time. We reverse and remand.

## I.     Background

Aspen Club & Spa, LLC and Aspen Redevelopment Company, LLC[3] (collectively or individually, "Aspen Club") commenced separate chapter 11 cases on May 16, 2019 in the United States Bankruptcy Court for the District of Colorado. The two cases subsequently were jointly administered. Aspen Club owns real property in downtown Aspen, Colorado on which it is in the process of developing luxury residential three- and four-bedroom condominiums, employee housing units, and a 60,800 square foot fitness club and spa (the "Property"). It took Aspen Club eight years and $5 million to obtain all approvals and licenses from local authorities to begin construction of the development project on the Property.

---

[2]     All future references to "Bankruptcy Code," "Code," or "§," refer to Title 11 of the United States Code.

[3]     Aspen Club Redevelopment Company, LLC is a wholly-owned subsidiary of Aspen Club & Spa, LLC. Aspen Club & Spa, LLC created Aspen Redevelopment Company, LLC in 2015 for the purpose of owning real property to be developed.

Aspen Club acquired ownership of the Property after consolidating $41 million of secured debt. Construction began in 2015 with over $18 million in presales and an expected completion date in 2018.

Aspen Club relied on several prepetition creditors to finance the construction and development of the Property. FirstBank agreed to provide $45 million in construction financing. By summer 2017, FirstBank had disbursed about $30 million but refused to lend the additional $15 million. Aspen Club Redevelopment Company, LLC recorded a deed of trust for the purpose of obtaining construction financing, which would provide up to $32 million to the project, but only $13 million was funded.[4] Additionally, FirstBank's refusal to extend additional funding led to a lack of future investment in the project. The lack of funding prevented Aspen Club from paying contractors and vendors, and by September 2017 construction halted. GPIF acquired FirstBank's interest in the $30 million loan. GPIF's claim in the bankruptcy cases is secured by the Property.

On July 23, 2019, the Bankruptcy Court issued a Memorandum Opinion and entered a Judgment determining that Aspen Club is subject to the SARE provisions of the Bankruptcy Code and extending the time under § 362(d)(3) until September 16, 2019 for Aspen Club to file a plan.[5]

---

[4] *Motion for Entry of an Order Approving Exit Financing Loan Agreement under 11 U.S.C. § 364 and Granting Related Relief* at 5, *in* Appellant's App. at 749.

[5] *Memorandum Opinion* at 5, *in* Appellant's App. at 670; *Judgment*, Bankr. ECF Dkt. No. 263.

Aspen Club sought Bankruptcy Court approval of debtor-in-possession financing from EFO Financial Group, LLC ("EFO Financial").[6] After conducting an evidentiary hearing, the Bankruptcy Court authorized Aspen Club to borrow up to $4.2 million from EFO Financial (the "DIP Loan") and granted EFO Financial a priming lien under § 364(c)(1) against the Property. In the hearing on the motion to approve debtor-in-possession financing, the Bankruptcy Court made the following finding on the record:

> So I need to make a finding on the value of the property for purposes of this motion and this motion only, and based upon the evidence and the testimony, I would [find] the property is worth no less than the ninety to one-hundred-million-dollar range in an as-is condition for the purposes of ruling on the motion.[7]

This is the only Bankruptcy Court finding of the value of the Property reflected in the record on appeal. There were about $25.4 million of estimated mechanics' lien claims at the time Aspen Club obtained the DIP Loan, secured by liens senior to GPIF's lien, which exceeded $34 million.[8] The estimated total pre-petition secured claims, including GPIF's claim, exceeded $67 million.[9]

Aspen Club filed a joint plan of reorganization on September 13, 2019 (the "Plan"), three days before expiration of the SARE period to file a plan, and a joint

---

[6] *Motion for Entry of Order Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 361, 362 and 364*, *in* Appellant's App. at 78.

[7] *Tr. of June 20, 2019 Hearing* at 33, *in* Appellant's App. at 1836-37.

[8] *Exhibit 1 to Motion for Entry of Order Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 361, 362 and 364*, *in* Appellant's App. at 109.

[9] *Id.*

disclosure statement on September 16, 2019.[10] The Plan defines "Debtors" as

Aspen Club, as debtors and debtors-in-possession in the bankruptcy cases.[11]

"Reorganized Debtors" is defined as the Debtors from and after the Plan effective

date.[12] The Plan provides that property of the estate vests in the Reorganized

Debtors on the Plan effective date.[13] The Plan effective date is the first business

day after the Plan is confirmed when there is no stay of the confirmation order in

effect and all conditions to the Plan effective date have occurred.[14] One of those

conditions is that the Bankruptcy Court shall have entered an order approving exit

financing on a super priority basis under §§ 364(c) and (d)(1) and that the exit

financing has been funded and made available to the Debtors and Reorganized

Debtors.[15]

With respect to exit financing, the Plan provides that the exit financing facility

will be advanced to the Reorganized Debtors, will be secured by a lien against all

property of the estate, and the lien against already encumbered property that secures the

loan will be senior and prior to all existing liens except liens securing allowed

---

[10]     *Joint Plan of Reorganization of the Aspen Club & Spa, LLC and Aspen Club Redevelopment Company, LLC, Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated September 16, 2019*, in Appellant's App. at 682; *The Debtors' Disclosure Statement for Their Joint Chapter 11 Plan of Reorganization Dated September 16, 2019*, in Appellant's App. at 816.

[11]     Plan, ¶ 1.31, *in* Appellant's App. at 693.

[12]     Plan, ¶ 1.108, *in* Appellant's App. at 701.

[13]     Plan, ¶ 11.1, *in* Appellant's App. at 733.

[14]     Plan, ¶ 1.46, *in* Appellant's App. at 695.

[15]     Plan ¶¶ 12.2(b) and (f), *in* Appellant's App. at 737-38.

5

mechanics lien claims.[16] The Plan also provides that confirmation will authorize the Reorganized Debtors to borrow monies from the exit lender, EFO Financial, and will authorize the Reorganized Debtors to execute the loan documents for the exit financing facility.[17]

The Plan proposes payment in full to holders of allowed mechanics' lien claims on the Plan effective date or as soon as practicable thereafter.[18] The Plan proposes payment to GPIF on terms summarized below.

A few days later, on September 16, 2019, Aspen Club filed a motion to approve exit financing pursuant to § 364(d) (the "Exit Financing Motion").[19] GPIF objected to the Exit Financing Motion. In the Exit Financing Motion, Aspen Club sought approval of an additional $140 million loan from EFO Financial secured by a lien that would prime GPIF's lien pursuant to § 364(d)(1).

The Exit Financing Motion recites that the exit loan would pay off the DIP Loan and approximately $26.5 million of mechanics' lien claims, both of which are secured by liens that are senior to the lien securing GPIF's clam, and that Aspen Club would use the balance of the funds to complete its development project. The terms of the exit loan are set forth in EFO Financial's exit loan commitment attached to the motion.[20]

---

[16]    Plan, ¶ ¶ 6.3(a), *in* Appellant's App. at 715.
[17]    Plan, ¶ ¶ 6.3(b), *in* Appellant's App. at 715.
[18]    Plan, ¶ 4.1(b), *in* Appellant's App. at 708.
[19]    Appellant's App. at 745.
[20]    Exhibit A to Exit Financing Motion, *in* Appellant's App. at 768.

The loan commitment defines "Borrower" as The Aspen Club & Spa, LLC, debtor and debtor in possession under Case Number 19-14158-JGR.[21] The loan commitment contemplates loan advances to enable the Borrower to pay off mechanics' liens and certain other creditors and to complete the development and construction of the project.[22] The loan commitment contains covenants that contemplate that the Borrower will own the collateral and that disbursements will be made to the Borrower.[23] Funds are not to be advanced to the Borrower all at once. The loan commitment provides funds will be advanced to pay for the construction and development of the project incrementally as work progresses. The terms of repayment to EFO Financial are (a) 75% of net cash flow to the EFO Financial, (b) 90% of net proceeds of sale of each living unit to EFO Financial until the principal balance is reduced by $50 million, after which the Borrower may pay the next $10 million of 90% of net sale proceeds to GPIF, (c) 90% of the next net proceeds of sale of each living unit to EFO Financial until the principal balance is reduced by another $50 million, after which the borrow may pay the next $10 million of 90% of net sale proceeds to GPIF, and (d) payment of 90% of the remaining net sale proceeds to the lender until the exit loan is paid in full.[24] The Plan provides for payment to GPIF consistent with these terms.

The Exit Financing Motion recites that the development project includes twenty to be completed three- and four-bedroom luxury residential condominiums, twelve to be

---

[21]    *Id.* at 1, *in* Appellant's App. at 768.
[22]    *Id.* at 2, *in* Appellant's App. at 769.
[23]    *Id.* at 14, *in* Appellant's App. at 781.
[24]    *Id.* at 8-10, *in* Appellant's App. at 775-77.

7

completed workforce housing units, and a world class club and spa.[25] The Exit Financing Motion further recites that five luxury condominiums units are 80% complete, five are 70% complete, and three are 60% complete; and other parts of the project are 30% complete.[26]

On October 4, 2019, GPIF filed a motion for relief from the automatic stay under the SARE provisions of § 362(d)(3) (the "Stay Relief Motion").[27] GPIF alleged the Plan is patently unconfirmable because it is predicated on non-consensual priming lien exit financing, which the Bankruptcy Court cannot approve, and, therefore, the Plan does not have a reasonable possibility of being confirmed within a reasonable time. GPIF alleged there is no legal basis upon which the Bankruptcy Court could approve the priming lien exit financing under § 364, because § 364 does not apply to exit financing, or under state law, because state law does not permit non-consensual priming liens. GPIF further alleged the proposed exit financing could not be crammed down under § 1129(b)(2)(a)(i), because GPIF would not retain its lien under the Plan, or under § 1129(b)(2)(a)(iii), because GPIF's would not realize the indubitable equivalent of its secured claim as a result of the proposed priming lien exit financing.

On October 25, 2019, the Bankruptcy Court entered an order setting a bifurcated non-evidentiary hearing on November 6, 2019 on the Exit Financing Motion in which the court would consider, solely as a matter of law, whether the proposed exit financing

---

[25]  Exit Financing Motion at 3, *in* Appellant's App. at 747.
[26]  Exit Financing Motion at 4, *in* Appellant's App. at 748.
[27]  Appellant's App. at 920.

8

could be approved on a priming lien basis under § 364(d)(1).[28] The Bankruptcy Court also set at the same time non-evidentiary preliminary hearings on the Stay Relief Motion and a pending motion under § 1121 to extend the exclusivity periods to file a plan and disclosure statement and to confirm a plan (the "Exclusivity Motion").[29]

On November 6, 2019, the Bankruptcy Court held a concurrent non-evidentiary hearing on the Exit Financing Motion, the Stay Relief Motion, and the Exclusivity Motion, and issued an oral ruling. At that hearing, the Bankruptcy Court acknowledged that whether Aspen Club's proposed exit financing can be approved is "a threshold issue in moving forward because if the debtor can't do that, then its plan is going to fail."[30] The Bankruptcy Court described its understanding of how the exit financing would work as follows:

> [T]he debtor's idea of how this works is the Court grants the motion to approve the exit financing, the liens are recorded while the property is property of the estate; the plan is confirmed, and then the exit loan is funded.[31]

After examining relevant caselaw, the Bankruptcy Court concluded there is no binding authority from the United States Supreme Court or Tenth Circuit, and no case directly on point, regarding whether the proposed exit financing can be approved under § 364(d)(1). The Bankruptcy Court stated, for that reason, it was not yet prepared to

---

[28] *Order Granting GPIF's Expedited Motion for Bifurcated Consideration of Debtors' Motion for Entry of an Order Approving Exit Financing Loan Agreement Under 11 U.S.C. § 364, in* Appellant's App. at 1566.
[29] *Id.* at 2, *in* Appellant's App. at 1567; *Motion to Extend Exclusivity Periods Under 11 U.S.C. § 1121(d), in* Appellant's App. at 675.
[30] *Tr. Nov. 6, 2019 Hearing* at 15, *in* Appellant's App. at 1783.
[31] *Id.* at 21, *in* Appellant's App. at 1789.

decide the § 364(d)(1) issue, and therefore ruled that Aspen Club was not "as a matter of law, precluded from seeking an exit financing facility on a first-priority priming lien senior to pre-existing liens on property of the estate pursuant to 11 U.S.C. § 364(d)(1)."[32]

Regarding the Stay Relief Motion, the Bankruptcy Court recognized that GPIF argued the Court should grant relief from the stay under § 362(d)(3) because there is no reasonable possibility of the Plan being confirmed within a reasonable time.[33] The Bankruptcy Court stated that if the Stay Relief Motion had been filed under a different subsection of § 362,[34] the court would have found that "the property definitely is necessary for an effective reorganization."[35]

The Bankruptcy Court ruled that it would deny the Stay Relief Motion for the following reasons:

> [T]here's equity in the property above the $95 million of debt, and a foreclosure by GPIF would benefit the Mechanic's Liens and GPIF and no other parties, and it's my job to look out for all the creditors and even the equity in every case, and so I would be a fool to lift the stay.[36]

Later in the hearing, the Bankruptcy Court observed,

> I did want to say, too, the debtor has an argument that even if 364 is not applied, the Court can use section 1123 to provide for modification of the lien and provision of indubitable equivalent. There's a Tenth Circuit case

---

32      *Judgment*, *in* Appellant's App. at 1755.
33      *Tr. of Nov. 6, 2019 Hearing* at 21, *in* Appellant's App. at 1789.
34      The Bankruptcy Court apparently was referring to § 362(d)(2), which provides for relief from the automatic stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C.A. § 362(d).
35      *Tr. of Nov. 6, 2019 Hearing* at 21, *in* Appellant's App. at 1789.
36      *Id.* at 22, *in* Appellant's Appx. at 1790.

10

*Wade v Bradford* cited in the papers that said that the bankruptcy court is authorized to modify a creditor's state law property rights, . . . and the debtor did have a case in its pleadings . . . which was a construction case where after evidentiary hearings, the Court did find that the adequate protection offered to the secured creditor was in the indubitable equivalent of its claim.[37]

By a separate Judgment entered November 6, 2019, the Bankruptcy Court denied the Stay Relief Motion.[38]

Finally, the Bankruptcy Court granted Aspen Club's motion to extend the exclusivity period to file a plan and disclosure statement until December 6, 2019, and to obtain acceptance of the plan until February 14, 2020, and required Aspen Club to file an amended plan and disclosure statement by November 22, 2019.[39] On November 22, 2019, Aspen Club filed an amended plan and an amended disclosure statement.[40]

## II. Jurisdiction & Standard of Review

"With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the

---

[37]    *Id.* at 32, *in* Appellant's App. at 1800.

[38]    "Motion for Relief from Stay filed by GPIF Aspen Club, LLC . . . is hereby DENIED." *Judgment*, *in* Appellant's App. at 1759.

[39]    *Tr. of Nov. 6, 2019 Hearing* at 31, *in* Appellant's App. at 1799; *Order Granting Motion to Extend Exclusivity Periods Under 11 U.S.C. § 1121(d)*, *in* Appellant's App. at 1763.

[40]    *Joint Amended Plan of Reorganization of the Aspen Club & Spa, LLC and Aspen Club Redevelopment Company, LLC, Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated September 16, 2019 and Amended November 22, 2019*, *in* Appellant's App. at 1857; *The Debtors' Amended Disclosure Statement for Their Joint Amended Chapter 11 Plan of Reorganization Dated September 16, 2019 and Amended November 22, 2019*, *in* Appellant's App. at 1921.

Tenth Circuit."[41] The United States Supreme Court recently determined that the denial

of a motion for relief from stay is a final, appealable order.[42] In *Ritzen*, the Supreme

Court held that "the adjudication of a motion for relief from the automatic stay forms a

discrete procedural unit within the embracive bankruptcy case . . .[which] yields a final,

appealable order when the bankruptcy court unreservedly grants or denies relief."[43]

Notwithstanding Aspen Club's assertion that the Stay Relief Order is not a final order

because the Bankruptcy Court did not conclusively resolve all the issues implicated by

the Stay Relief Motion, the denial of stay relief is subject to immediate appellate

review.[44] Denial of the Stay Relief Motion ended the contested matter initiated by the

filing of the Stay Relief Motion. Further, none of the parties elected to have this appeal

heard by the United States District Court for the District of Colorado pursuant to 28

U.S.C. § 158(c). Thus, this Court has jurisdiction over the appeal.

---

[41]      *Straight v. Wyo. Dep't of Transp. (In re Straight)*, 248 B.R. 403, 409 (10th Cir.
BAP 2000) (quoting 28 U.S.C.A. § 158(a)(1) and citing 28 U.S.C.A. § 158(b)(1), (c)(1)
and Fed. R. Bankr. P. 8002).

[42]      *Ritzen Grp., Inc. v. Jackson Masonry, LLC,* 140 S. Ct. 582, 586 (2020). The
United States Supreme Court's holding confirms prior Tenth Circuit Court of Appeals'
precedent. *See Eddleman v. U.S. Dep't of Labor,* 923 F.2d 782, 785 (10th Cir. 1991)
("Immediate appeal from district court orders granting or denying relief from the
automatic stay is necessary to effectuate Congress' intent to settle these matters
quickly."), *modified by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein &
Johnson*, 968 F.2d 1003 (10th Cir. 1992).

[43]      *Ritzen Grp.*, 140 S. Ct. at 586.

[44]      *Id.* at 589 (an order denying relief from the automatic stay is a "final, immediately
appealable decision[ ]").

The decision whether to grant relief from the automatic stay is reviewed for abuse of discretion.[45] An abuse of discretion "may exist when a ruling is premised on an erroneous conclusion of law or on clearly erroneous fact findings."[46]

## III.    Analysis

### A.    *The Stay Relief Standard Applicable to SARE Debtors*

GPIF sought stay relief under § 362(d)(3).[47] Under that Code section,

> a creditor with a secured interest in "single asset real estate," is entitled to relief from the stay unless the debtor, within 90 days of entry of the order for relief, either files a plan with a "reasonable possibility" of confirmation, or

---

[45]    *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1023 (10th Cir. 1994) (citing *Pursifull v. Eakin*, 814 F.23 1501, 1504 (10th Cir. 1987)).

[46]    *In re Utah Aircraft Alliance*, 342 B.R. 327, 331 (10th Cir. BAP 2006) (citing *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1165 (10th Cir. 1998)).

[47]    Section 362(d)(3) provides, in relevant part:
> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
>>> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>>> (B) the debtor has commenced monthly payments that—
>>>> . . .
>>>> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

commences monthly payments to the creditor in the amount of the applicable nondefault contract interest rate.[48]

Thus, to avoid stay relief, a SARE debtor must either (a) make monthly interest payments or (b) file a plan before expiration of the period specified in § 362(d)(3) (the "SARE Period"), including any extensions, that has a reasonable possibility of being confirmed within a reasonable time. Aspen Club did not make monthly payments to GPIF. Therefore, GPIF was entitled to relief from the stay if the Plan filed before expiration of the SARE Period did not have a reasonable possibility of being confirmed within a reasonable time.

The SARE Period, as extended by the Bankruptcy Court, expired on September 16, 2019, prior to the time GPIF filed its Stay Relief Motion and prior to the preliminary hearing on the Stay Relief Motion held November 6, 2019. Therefore, to decide the Stay Relief Motion, the Bankruptcy Court was required to determine whether the Plan, filed September 13, 2019, had a "reasonable possibility of being confirmed within a reasonable time."[49] If not, because the language of § 362(d)(3) is

---

[48]    *In re Bluejay Props., LLC*, 512 B.R. 390, 2014 WL 948631, at *2 (10th Cir. BAP Mar. 12, 2014) (internal citations omitted) (unpublished).
[49]    11 U.S.C.A. § 362(d)(3)(A). *See, e.g., In re River E. Plaza, LLC*, 669 F.3d 826, 833–34 (7th Cir. 2012) (affirming decision of the bankruptcy court to grant stay relief because the 90-day deadline of § 362(d)(3) had "expired long ago" and a third proposed plan was just being submitted); *In re RYYZ, LLC*, 490 B.R. 29, 34 (Bankr. E.D.N.Y. 2013) (unless interest only payments are made, a plan filed within the statutory time period must have a reasonable possibility of being confirmed within a reasonable time); *In re Carolina Commons Dev. Grp., LP*, No. 09-11230-8-JRL, 2010 WL 1965895, at *2 (Bankr. E.D.N.C. May 17, 2010) (unpublished) (same); *In re RIM Dev., LLC*, 448 B.R. 280, 288 (Bankr. D. Kan. 2010) (same). *See also In re Carlsbad Dev. I, LLC*, No. 08-27768, 2009 WL 588662, at *3 (Bankr. D. Utah Mar. 6, 2009) (unpublished) ("To prove a reasonable possibility of confirmation within a reasonable time [under § 362(d)(3)],

14

mandatory,[50] the Bankruptcy Court was required to grant some form of relief from the automatic stay.[51] Aspen Club, as the party opposing stay relief, had the burden of proof on all issues except Aspen Club's equity in the property pledged to GPIF.[52]

GPIF contended that the Plan filed near the end of the SARE Period had no reasonable possibility of being confirmed because it was predicated on priming lien exit financing that could not possibly be approved. The Bankruptcy Court denied the Stay Relief Motion based on a finding there was equity in the Property above the existing debt. That finding was an insufficient reason, by itself, to deny stay relief under the SARE stay relief standard because the SARE stay relief standard requires evidence that

---

the Debtor must at least show that 'the proposed . . . plan has a realistic chance of being confirmed [and] is not patently unconfirmable . . .'") (quoting *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D. W. Va. 2008)).

[50]    11 U.S.C.A. § 362(d) (the court "*shall*" grant relief from the stay); *In re CBJ Dev., Inc.*, 202 B.R. 467, 470 (9th Cir. BAP 1996) (if the debtor has not complied with the requirements of § 363(d)(3), stay relief is mandatory) (citing *NationsBank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996); *In re RIM Dev., LLC*, 448 B.R. at 288 (noting that if the debtor's "plan is not confirmable, stay relief is mandatory").

[51]    In SARE cases, consideration of stay relief under § 362(d)(3) does not leave a bankruptcy court without some discretion, however. The bankruptcy court has the authority to extend the 90-day period specified in § 362(d)(3), and there is no statutory cap on the number of days for the extension. *See* § 362(d)(3) (authorizing the court to extend the 90-day period "for cause" by an order entered within the 90-day period). A bankruptcy court can also reasonably delay the final hearing on a § 362(d)(3) stay motion until after the 90-day period, as extended, expires, so the debtor has the full benefit of that period to propose a plan that has a reasonable possibility of being confirmed within a reasonable time. In addition, the bankruptcy court has discretion regarding the type of stay relief to grant. *See* § 362(d) (providing for relief from stay "by terminating, annulling, modifying, or conditioning such stay").

[52]    *See* 11 U.S.C.A. § 362(g) (the party requesting stay relief under subsection (d) of § 362 has the "burden of proof on the issue of the debtor's equity in property" and the party opposing stay relief "has the burden of proof on all other issues").

15

the debtor has a reasonable possibility of confirming a plan within a reasonable time.

The Bankruptcy Court also observed that it would find that the Property "undoubtedly is necessary to an effective reorganization" if the Stay Relief Motion had been filed under a different subsection of § 362. [53] If the Bankruptcy Court meant by that observation that Aspen Club had a feasible plan in prospect, the Bankruptcy Court arguably addressed the SARE stay relief standard. [54] However, because the Bankruptcy Court did not address whether the proposed exit financing with priming lien could possibly be approved, without which the Plan could not possibly be confirmed, the Bankruptcy Court did not properly apply the SARE stay relief standard.

The Dissent argues that if the possibility that a plan might be confirmed depends on how an unsettled legal issue is decided, a bankruptcy court may deny stay relief on the theory that the plan may possibly be confirmed depending on how the legal issue is decided. Under the SARE standard, a bankruptcy court is required to determine whether a plan has "a reasonable possibility of being confirmed within a reasonable time."[55] Before denying the § 362(d)(3) motion, the SARE standard required the Bankruptcy Court to rule on whether exit priming lien financing needed to fund the Plan is permissible as a matter of law. In applying the SARE standard, the unsettled nature of

---

[53] *Tr. of Nov. 6, 2019 Hearing* at 34, *in* Appellant's App. at 1837.

[54] In *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988), the United States Supreme Court held that property "necessary to an effective reorganization," under subsection (d)(2) of § 362 means "the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time." (internal quotation and citations omitted).

[55] 11 U.S.C.A. § 362(d)(3)(A).

applicable law does not excuse a bankruptcy court from deciding a legal issue that must be decided to determine whether there exists a legal bar to confirmation of the plan.

The Dissent focuses on the lack of a Circuit Court opinion and the scant bankruptcy court authority on the §§ 362(d)(3) and 364 issues presented. There is a good reason for this "lack of authority." Section 362(d)(3) was added to the Bankruptcy Code as part of the Bankruptcy Reform Act of 1994.[56] Section 364 has been part of the Code since the Bankruptcy Reform Act of 1978.[57] There have been hundreds of SARE cases filed since then. There is little authority because a plain reading of § 362(d)(3) and § 364 leave little room for interpretation. Nevertheless, it is clear that before denying a § 362(d)(3) motion, the Bankruptcy Court must rule on whether postconfirmation priming lien financing needed to fund the plan is legally permissible.

In connection with its decision to defer ruling on the Exit Financing Motion, the Bankruptcy Court observed that whether Aspen Club's proposed exit financing can be approved is "a threshold issue in moving forward because if the debtor can't do that, then its plan is going to fail."[58] Although the Bankruptcy Court acted within its discretion in deciding to defer any ruling on the Exit Financing Motion, to determine whether the Plan had a reasonable possibility of being confirmed within a reasonable time the Bankruptcy Court was required under the SARE stay relief standard to decide whether Aspen Club had a reasonable possibility of obtaining court approval of the exit

---

[56]      Pub. L. 103-394, § 218(b), 108 Stat. 4106 (1994).
[57]      Pub. L. 95-598, § 364, 92 Stat. 2574 (1978).
[58]      *Tr. of Nov. 6, 2019 Hearing* at 15, *in* Appellant's App. at 1783.

financing, without which the Plan would fail. The Bankruptcy Court abused its discretion in denying the Stay Relief Motion because it did not determine whether the exit financing priming lien component in the Plan prevented Aspen from confirming a plan within a reasonable time.[59]

The Dissent argues it is inconsistent to determine that the Bankruptcy Court was within its discretion to defer its ruling on the Exit Financing Motion and at the same time conclude that it was error for the Bankruptcy Court *not* to decide whether the exit financing priming lien component of the Plan prevented Aspen from confirming a plan within a reasonable time. These positions are consistent. The Bankruptcy Court deferred ruling on the Exit Financing Motion but made a final ruling on the stay relief motion.[60] By deferring a ruling on the Exit Financing Motion, the Bankruptcy Court did not yet need to decide the § 364 issue. But by issuing a final order denying the stay motion, the Bankruptcy Court needed to decide whether § 364 precluded confirmation of the Plan.

We could end our discussion here, and remand for the Bankruptcy Court to determine whether Aspen Club had a reasonable possibility of confirming a plan within a reasonable time, given the Plan's proposed exit financing. However, because the parties extensively argued and briefed the exit financing priming lien issues to the Bankruptcy Court and on appeal, the issues for us to decide are questions of law, the

---

[59] *See Mid-Continent Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 981 (10th Cir. 2012) (a trial court abuses its discretion when its decision is based on "the misapplication of legal standards") (citing *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1165 (10th Cir. 1998)).
[60] *Ritzen Grp., Inc. v. Jackson Masonry, LLC,* 140 S. Ct. 582, 586 (2020).

issues impact plan confirmation, and plan confirmation potentially could moot a later appeal of whether exit priming lien financing is permitted under § 364, §§ 1123 and 1129, or both,[61] we exercise our discretion to consider those issues.[62]

The Dissent criticizes our decision to reach legal issues the Bankruptcy Court did not decide and emphasizes not impinging on the Bankruptcy Court's discretion. Unfortunately, that is exactually what Congress intended in § 362(d)(3). Congress wanted to limit bankruptcy judges' discretion to prolong a SARE case unless monthly payments have commenced or unless "the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time."[63] Thus, the Bankruptcy Court must rule on this question when presented.

The Dissent vituperously argues that in deciding whether to address those legal issues in this appeal it is inappropriate to take into account the fact that if the legal issues

---

[61]    For a discussion of statutory, equitable and prudential mootness as it relates to approval of financing under § 364 and confirmation of a chapter 11 plan, *see In re Long Shot Drilling, Inc.*, 224 B.R. 473, 479 (10th Cir. BAP 1998).

[62]    *See Singleton v. Wulff,* 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. . . . [C]ircumstances in which a federal appellate court is justified in resolving an issue not passed on below . . . [include] where 'injustice might otherwise result.'" (internal quotation omitted)). *See also AAR Int'l, Inc. v. Nimelias Enters., S.A.* 250 F.3d 510, 523 (7th Cir. 2001) (it is appropriate for an appellate court to address an issue not decided by the trial court where "'both parties have briefed and argued [the issue's] merits,' and where 'the benefit of a district court hearing is minimal because proper resolution of the issue is clear.'") (quoting *United States v. Brown*, 739 F.2d 1136, 1145 (7th Cir. 1984)); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271 (10th Cir. 2000) (appellate review of an issue not passed on below is appropriate "[w]here the issue 'is purely a matter of law . . . and . . . its proper resolution is certain'") (quoting *Ross v. United States Marshal*, 168 F.3d 1190, 1195 n.5 (10th Cir. 1999)).

[63]    11 U.S.C.A. § 362(d)(3)(A).

are not addressed in this appeal the issues may become moot if exit financing is funded under a plan confirmed in error. It is within the reasonable discretion of an appellate court to address legal issues that a trial court erroneously failed to address where, as here, the parties extensively argued and briefed the legal issues to the trial court and on appeal, and by addressing the issues it may obviate the need for further appeals or avoid the injustice of confirming a plan in error without recourse to an appeal. The SARE stay relief provisions exist so that a creditor may obtain a prompt decision on stay relief without having to endure the additional delay and expense of a confirmation hearing if confirmation is not possible.[64]

**B.**     *Whether the Plan is patently unconfirmable as a matter of law*

In seeking stay relief, GPIF argues that the Plan is patently unconfirmable for two reasons. First, GPIF argued that § 364(d)(1), applicable to obtaining credit, does not authorize post-confirmation exit financing on a priming lien basis. Second, even if Aspen Club could seek priming lien exit financing through a plan other than through § 364(d)(1), GPIF argues that such a plan cannot satisfy the indubitable equivalence confirmation requirement of § 1129(b)(3)(A)(iii) under the existing facts.

---

[64]     *See* 3 Collier on Bankruptcy ¶ 362.07[5][b], at 362-122 (16th ed. 2010) ("The purpose of § 362(d)(3) is to address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully."); *see also In re Scotia Pac. Co.*, 508 F.3d 214, 225 (5th Cir. 2007) (noting that "SARE debtors are carved out and subjected to stringent requirements in § 362(d)(3) which expedite the time for SARE debtors to file a plan of reorganization or commence making monthly payments, failing which the automatic stay is promptly lifted.").

### 1. *Section 364(d)(1) does not authorize post-confirmation exit financing if property of the estate vests post-confirmation*

Under § 364(d)(1), a debtor-in-possession with the powers of a trustee[65] may obtain credit secured by a senior lien on property of the estate if the debtor-in-possession cannot obtain credit otherwise, and provided the existing lienholder is adequately protected.[66] Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on *property of the estate* that is subject to a lien only if—
>
> (A)    the *trustee* [or debtor-in-possession with the powers of a trustee] is unable to obtain such credit otherwise; and
> (B)    there is adequate protection of the interest of the holder of the lien on the *property of the estate* on which such senior or equal lien is proposed to be granted.[67]

"Because the statutory language of § 364 uses the terms "trustee" and "property of the estate," GPIF argues that post-confirmation exit financing on a priming lien basis is precluded as a matter of law.

It is not clear from the record on appeal how Aspen Club's proposed exit financing would work. The Bankruptcy Court stated at the November 6, 2019 hearing that Aspen Club's idea is that the Court grants the Exit Financing Motion, the liens are recorded while the collateral is property of the estate, the Plan is confirmed, and then the exit loan is funded. However, the Plan authorizes the "Reorganized Debtors," not the

---

[65]    *See* 11 U.S.C.A. § 1107(a) ("[A] debtor in possession shall have all the rights . . . and powers . . . of a trustee serving in a case under this chapter.").
[66]    11 U.S.C.A. § 364(d)(1).
[67]    *Id.* (emphasis added).

debtors-in possession, to execute the loan documents and borrow the funds. The Reorganized Debtors do not come into existence until after the Plan effective date when property of the estate no longer exists. Further, the exit financing loan is conditioned on plan confirmation.

As it makes no difference to the result we reach, we will address both the scenario in which one of the Reorganized Debtors executes the loan documents and borrows the funds, and the scenario in which Aspen Club as debtor-in-possession executes the loan documents and the liens are recorded while the collateral remains property of the estate, with funding to occur post-confirmation.

GPIF argues that the exit financing cannot be approved under § 364 as a matter of law because (a) Aspen Club as reorganized debtor, not as debtor-in-possession, will obtain the credit, and (b) the liens will not attach to property of the estate. If Aspen Club as Reorganized Debtor will execute the loan documents and the liens will be recorded after the collateral no longer is property of the estate, we agree that the exit financing cannot be approved under § 364 as a matter of law for the reasons GPIF argues.

Section 364(d)(1) provides that in certain circumstances the court may authorize the trustee to obtain credit secured by a priming lien on property of the estate. Although § 364(d)(1) by its terms applies to the trustee, under § 1107(a), with exceptions not applicable here, the debtor-in-possession has the rights and powers of a trustee, including those under § 364. But post-confirmation, after the property of the estate has

vested in the reorganized debtor, the debtor-in-possession no longer exists[68] and there no longer is any property of the estate.[69] If the credit is obtained by the reorganized debtor and the liens attach to property of the reorganized debtor, then neither the § 364(d)(1) requirement that the "trustee" obtain the credit nor the § 364(d)(1) requirement that the liens are "on property of the estate," can be satisfied.[70]

The United States Supreme Court addressed a similar issue in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*[71] That case involved the question of whether a creditor may surcharge collateral under § 506(c). Like § 364(d)(1), § 506(c) uses the term "trustee" and provides that "[t]he *trustee* may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim . . . ."[72] The Supreme Court rejected the creditor's argument that because

---

[68] *In re Schupbach Invs., L.L.C.*, 808 F.3d 1215, 1222 (10th Cir. 2015); *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008).

[69] *E.g. Penthouse Media Group v. Guccione (In re Gen. Media, Inc.),* 335 B.R. 66, 74 (Bankr. S.D.N.Y. 2005) (when the property of the estate vests in the reorganized debtor, "[t]he estate comes to an end, and ceases to exist"); *In re Shank,* 240 B.R. 216, 221 (Bankr. D. Md. 1999) (same).

[70] *See In re SAI Holdings, Ltd.*, No. 06-33227, 2012 WL 3201893, at * 7 (Bankr. N.D. Ohio) (unpublished) ("By its express terms, § 364(c) and (d) refer only to the obtaining of credit by the bankruptcy trustee, or Debtors-in-Possession in this case. . . . After confirmation . . . Debtors were no longer Debtors-in-Possession. . . ."); *In re Schupbach Invs., L.L.C.*, 808 F.3d at 1222 ("[D]ebtor-in-possession status terminates . . . upon confirmation of a Chapter 11 plan.") (citing *In re United Operating, LLC*, 540 F.3d at 355).

[71] 530 U.S. 1, 10 (2000).

[72] 11 U.S.C.A. § 506(c).

§ 506(c) does not say "only the trustee,"[73] and the Bankruptcy Code uses that language elsewhere, creditors as well as the trustee can surcharge collateral under § 506(c). After examining pre-Code practice and bankruptcy policy, the Supreme Court based its decision that only the trustee can invoke § 506(c) on the most natural reading of the statute.[74]

In addition, the courts in *In re SAI Holdings, Ltd.*,[75] *In re Les Ruggles & Sons, Inc.*,[76] and *In re Hickey Props., Ltd.*[77] and have held that § 364 does not apply to post-confirmation exit financing.[78] Those cases reason that § 364(d)(1) only authorizes credit secured by a lien against property of the estate, which no longer exists upon

---

[73]   *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 8 (2000).

[74]   *But see, e.g., In re Texas Wyoming Drilling, Inc.,* 647 F.3d 547, 550 (5th Cir. 2011); *In re Mako, Inc.*, 985 F.2d 1052, 1055–56 (10th Cir. 1993); *In re Bridgeport Holdings, Inc.*, 326 B.R. 312, 328 (Bankr. D. Del. 2005), *amended by* No. 03-12825 (PJW), 2005 WL 1943535 (Bankr. D. Del. Aug. 12, 2005) (unpublished). In these and other cases courts hold that under § 1123(b)(3) a plan may preserve preference and avoidances actions for a reorganized debtor even though §§ 547 and 548 provide that the "*trustee*" may avoid certain transfers. By contrast, § 1123 does not provide that a plan may preserve for the benefit of a reorganized debtor the right to obtain credit under § 364, and, as discussed below, §§ 1123 and 1129 provide a different means by which a debtor may obtain court approval of exit financing.

[75]   No. 06-33227, 2012 WL 3201893 (Bankr. N.D. Ohio Aug. 3, 2012) (unpublished).

[76]   222 B.R. 344 (Bankr. D. Neb. 1998).

[77]   181 B.R. 173 (Bankr. D. Vt. 1995).

[78]   *In re SAI Holdings Ltd.*, 2012 WL 3201893 at *7 (Section 364(d)(1) "does not apply on a post-confirmation basis."); *see also In re City of Detroit*, 524 B.R. 147, 276 (Bankr. E.D. Mich. 2014) (agreeing that § 364 does not apply to post-confirmation exit financing); *In re Les Ruggles & Sons, Inc.*, 222 B.R. at 345 (concluding that § 364(d)(1) does not apply to post-confirmation borrowings); *In re Hickey Props. Ltd.*, 181 B.R. at 174 ("We hold that § 364(d)(1) does not apply to post-confirmation borrowings.").

confirmation.[79] We find those cases persuasive if Aspen Club as Reorganized Debtor (not as debtor-in-possession) will execute the loan documents and the liens will be recorded after the collateral no longer is property of the estate.

On the other hand, it is less clear whether § 364(d) governs exit financing under the second scenario in which the Bankruptcy Court would grant the debtor-in-possession's Exit Financing Motion, the liens are recorded while the collateral is property of the estate, the Plan is confirmed, and then the exit loan is funded. Under that scenario, Aspen Club's proposed exit financing is a hybrid that straddles confirmation. For the reasons explained below, we nevertheless conclude under this second scenario that a debtor may not rely on § 364 to obtain exit financing that primes existing secured creditors.

Section 364 is designed to provide a mechanism for the trustee or debtor-in-possession to obtain credit to finance the operation of the business of the debtor or to fund the cost of administering the bankruptcy case, not to finance post-confirmation operations after the property of the estate has vested in the reorganized debtor.

---

[79]    11 U.S.C.A. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."); *In re Hickey Properties, Ltd.*, 181 B.R. at 174 (reasoning that because plan confirmation vests property of the estate in the debtor per § 1141(b), and § 364(d)(1) only authorizes superpriority liens on property of the estate, § 364(d)(1) cannot apply to post-confirmation borrowings because no property remains in the estate after confirmation to which a superpriority lien can attach); *In re Les Ruggles & Sons, Inc.*, 222 B.R. at 345 (because confirmation of a chapter 12 plan vests all property of the estate in the debtor, § 364(d)(1) does not apply to post-confirmation borrowings).

Subsection (a) provides that "if the trustee is authorized to operate the business of the debtor . . . the trustee may obtain unsecured credit . . . in the ordinary course of business . . . allowable under section 503(b)(1) . . . as an administrative expense."[80] Subsections (b) – (d) of § 364 are "structured with an escalating series of inducements which a debtor in possession may offer to attract credit in the post-petition period."[81]

Because subsection (a) only applies to unsecured credit incurred in the trustee's or debtor-in-possession's operation of the debtor's business and provides for repayment of the unsecured credit as an administrative expense of the bankruptcy estate, § 364(a) necessarily contemplates obtaining credit to finance the administration of the estate while the trustee or debtor-in-possession is operating the business.[82] Administrative expenses allowable under § 503(b)(1) are, by definition, expenses of the bankruptcy estate.[83]

---

[80]    11 U.S.C.A. § 364(a).

[81]    *Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.*), 87 B.R. 835, 839(Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d Cir. 1989). *See also In re Mayco Plastics, Inc.*, 379 B.R. 691, 705 (Bankr. E.D. Mich. 2008) (noting the "'escalating series of inducements' that § 364 provides to a debtor and their relationship to one another within" § 364 (quoting *In re Sobiech*, 125 B.R. 110, 114 (Bankr. S.D.N.Y. 1991)); *In re Titan Indus., Inc.*, No. MW 00-104, 2001 WL 36381910, at *2 (1st Cir. BAP June 29, 2001) (unpublished) (same).

[82]    *See Rajala v. Langer (In re Lodge Am., Inc.),* 259 B.R. 728, 731 (D. Kan. 2001) ("Section 364(a) of the Bankruptcy Code allows a debtor-in-possession operating the business of the debtor under § 1108 to incur unsecured debt in the ordinary course of business and provides that debt so incurred shall be given priority as an administrative expense under § 503(b)(1).").

[83]    Section 503(b)(1) provides that the "actual, necessary costs and expenses of preserving the estate" are administrative expenses.

Under § 503(b)(1), administrative expense and super-priority administrative expense status are two of the escalating series of inducements a debtor-in-possession may offer to attract credit under subsections (b) – (d) of § 364.[84] It does not make sense to use an administrative expense priority status as one of the escalating inducements for exit financing. Section § 503(b)(1) administrative expense status is granted only for costs and expenses of preserving the bankruptcy estate, not to finance post-confirmation operations after there no longer is a bankruptcy estate. Further, to confirm a plan, § 1129(a)(9)(A) requires that administrative expenses be paid in full on the plan effective date unless the holder of the claim agrees otherwise. A loan to finance post-confirmation operations by its nature is not due in full on the plan effective date.

2.     *Post-confirmation exit financing on a priming lien basis is permissible if it satisfies the requirements of § 1129*

Even though exit financing under § 364 is not available post-confirmation, a debtor may obtain court approval for priming lien exit financing under a plan pursuant to §§ 1123(a)(5)(E) and 1129(b)(2)(A). The Bankruptcy Code authorizes the satisfaction or modification of a lien through a plan pursuant to § 1123(a)(5)(E). Modification of liens

---

[84]     Subsection (b) of § 364 gives the trustee, with court approval, authority to obtain unsecured credit other than in the ordinary course of business allowable under § 503(b)(1) as an administrative expense. If the trustee is unable to obtain unsecured credit allowable under § 503(b)(1) as an administrative expense, subsection (c) of § 364 gives the trustee, with court approval, authority to obtain credit, as a super-priority administrative expense, secured by unencumbered estate property, or secured by a junior lien on encumbered estate property. If the trustee is unable to obtain credit otherwise, subsection (d) gives the trustee, with court approval, authority to obtain credit secured by a lien against encumbered estate property of equal or senior priority to exiting liens.

under a plan provision authorized by § 1123(a)(5)(E) requires satisfaction of § 1129(b)(2)(A) if the claimant whose lien is being modified is in a nonaccepting class.

To confirm a plan that impairs a claim of a creditor whose claim is in a nonaccepting class, §§ 1129(a)(8) and (b)(1) require that the plan must not discriminate unfairly, and must be fair and equitable, with respect to each class of claims or interests that is impaired under and has not accepted the plan. A plan that impairs a secured claim does not discriminate unfairly and is fair and equitable with respect to each such nonaccepting class if the plan satisfies one of the three subsections of § 1129(b)(2)(A). Those alternative subsections require that (i) a creditor "retains" its lien; (ii) a creditor's lien transfers to the proceeds of a sale pursuant to § 363(k); or (iii) a creditor will realize the "indubitable equivalent" of its claim.[85]

Section 1129(b)(2)(A)(i) allows modification of the obligations a lien secures. It "allows the plan proponent to write a new loan for full payment at a market rate of interest secured by the creditor's *prepetition collateral*."[86] But the Plan proposes to subordinate GPIF's lien to exit financing. A lien is an interest in property.[87]

---

[85]    11 U.S.C.A.§ 1129(b)(2)(A)(i)-(iii).

[86]    *In re Inv. Co. of The SW, Inc.*, 341 B.R. 298, 318 (10th Cir. BAP 2006) (emphasis added).

[87]    *See, e.g. In re Kressler*, 40 F. App'x 712, 713 (3d Cir. 2002) (there is a "long-standing rule in bankruptcy that a lien is a property interest"); *In re Mayes*, 294 B.R. 145, 155 (10th Cir. BAP 2003) (noting that "numerous courts . . . hold that a judicial lien is a property interest"); *Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 428 (9th Cir. BAP 2002) (noting that in California, "a lien constitutes a property interest"); *In re Miglia*, 345 B.R. 919, 922 (Bankr. N.D. Iowa 2006) ("an attorney's lien is a property interest"); *In re Rivera*, 256 B.R. 828, 833 (Bankr. M.D. Fla. 2000) (a judicial lien is a property interest).

Subordination of a lien modifies that property interest. There is a difference between modifying obligations the lien secures and modifying the lien itself. A plan can modify the interest rate, payment terms, and default provisions of the obligation without modifying the lien itself. However, changing the property to which the lien attaches, or altering the priority of the lien, modifies the lien itself.[88] Accordingly, subsection (b)(2)(A)(i) of § 1129 does not apply to altering the priority of a lien.

Subsection (b)(2)(A)(ii) of § 1129 does not apply either. "Section 1129(b)(2)(A)(ii) permits a plan that sells the creditor's collateral free and clear of the lien, so long as the lien attaches to all net proceeds of the sale."[89] The Plan does not propose a sale of the collateral or transfer of GPIF's lien to sale proceeds.

Therefore, through elimination,[90] to confirm a plan that modifies a lien pursuant to § 1123(a)(5)(E) by altering the priority of the lien, the plan proponent must satisfy the requirements of § 1129(b)(2)(A)(iii).[91] Section § 1129(b)(2)(A)(iii) requires that to

---

[88]   *See, e.g. In re Ford Prods. Corp.,* 159 B.R. 693, 695 (Bankr. S.D.N.Y. 1993) (if the lien is subordinated the creditor does not retain its lien under § 1129(b)(2)(A)(i)). See also *In re Cottonwood Corners Phase V, LLC*, No. 11-11-12663 JA, 2012 WL 566426, at *23 (Bankr. D.N.M. Feb. 17, 2012) (following *In re Ford Prods. Corp.*) and *In re Scrubs Car Wash, Inc.*, 527 B.R. 453, 459 (Bankr. D. Colo. 2015) (same, but in the context of a § 1111(b) election).

[89]   *In re Inv. Co. of The SW, Inc.*, 341 B.R. at 318.

[90]   *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012) (stating § 1129(b)(2)(A)(iii) "is a residual provision covering dispositions under all other plans").

[91]   *Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.),* 80 B.R. 171, 174–75 (9th Cir. BAP 1987) (applying subsection (iii) of § 1129(b)(2)(A), not subsection (i), to a lien primed under the terms of the plan); *In re Cottonwood Corners Phase V, LLC*, 2012 WL 566426, at *23 (concluding that modifying lien rights by subordination does not satisfy § 1129(b)(2)(A)(i)); *Affiliated Nat'l Bank–Englewood v. TMA Assocs., Ltd. (In re TMA Assocs., Ltd.),* 160 B.R. 172, 176 (D.Colo.1993) (applying subsection (iii) of

confirm a plan over the objection of a secured creditor in a nonaccepting class, whose lien is primed under the plan, the creditor must realize the indubitable equivalent of its claim.

"The phrase 'indubitable equivalent' is derived from Judge Learned Hand's decision in *In re Murel Holding Corp*."[92] In that case, the United States Court of Appeals for the Second Circuit reversed a denial of relief from the bankruptcy stay where a creditor proposed to subordinate a first mortgagee's lien to a second mortgagee's loan to improve the collateral.[93] The plan also provided the first mortgagee would suspend mortgage payments, extend the due date, and receive 5.5% interest.[94] Upon these terms, the Second Circuit held the plan treatment failed to provide the first mortgagee with adequate protection and concluded the intent of the bankruptcy statute did not allow a debtor to subordinate a first in line creditor's claim "unless by a substitute of the most indubitable equivalence."[95]

---

§ 1129(b)(2)(A)); *but see In re Secured Storage Sys. II*, No. 91-14262S, 1992 WL 109064, at *2 (Bankr. E.D. Pa. May 15, 1992) ("We also decline [the] invitation to hold that any lien-priming is inconsistent with the requirement that a security holder must be allowed to retain its lien. Such an absolute rule is not supported by the Code or caselaw. However, in order to overcome such an objection, the protection of the secured creditor's interest must be more satisfactory than the instant plan contemplates.").

[92] *In re Inv. Co. of The SW*, 341 B.R. at 319 (citing *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935)); *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460-61 (10th Cir. 1985) (noting case law indicating "indubitable equivalent" is derived from Judge Learned Hand's opinion).

[93] *In re Murel Holding Corp.*, 75 F.2d at 941-42.

[94] *Id.* at 942.

[95] *Id.*

In *Investment Company of The Southwest, Inc.* the Tenth Circuit Bankruptcy

Appellate Panel held "[t]he key to indubitable equivalence is that the substituted

treatment of the creditor be indubitably equivalent to the creditor's secured claim."[96] A

secured creditor will realize the indubitable equivalent of its claim under

§ 1129(b)(2)(A)(iii) only if substituting collateral or subordinating a lien "does not

increase the creditor's exposure to risk"[97] with respect to receiving the full value of its

allowed secured claim.

### 3. *Because indubitable equivalence has a factual component, the matter must be remanded to the Bankruptcy Court*

Whether the indubitable equivalent requirement is satisfied is a mixed question of

law and fact.[98] The record before this Court reflects that the Bankruptcy Court made its

---

[96]     *See In re Inv. Co. of The SW, Inc.*, 341 B.R. at 319 ("Evidence of the requisite indubitable equivalent is present if, under the treatment proposed . . . , there is no reasonable doubt that [a creditor] will receive the full value of what it bargained for when it made its contract with [the d]ebtor.").

[97]     *See id.* (citing *In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th Cir. 1996), explaining key factors to determining whether substitute collateral was indubitable equivalent are the value of the new collateral and the degree of risk the substitution imposes on a creditor); *see also In re River E. Plaza, LLC*, 669 F.3d 826, 831 (7th Cir. 2012) (citing authority supporting the substitution of collateral where substitution does not increase the risk of becoming undersecured); *In re Wiersma*, 227 F. App'x 603, 2007 WL 1073782, at *3 (9th Cir. Apr. 6, 2007) ("'providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure" quoting *In re Arnold & Baker Farms*, 85 F.3d at 1422); *In re Sparks*, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994) (same).

[98]     *In re Pine Mountain, Ltd.*, 80 B.R. 171, 172 (9th Cir. BAP 1987); *In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("the question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact and our review is therefore deferential") (citation omitted). The Ninth Circuit BAP in *In re Pine Mountain, Ltd.* affirmed confirmation of a plan that subordinated a secured claim to a construction financing lender where the debtor would complete work in three phases, selling or refinancing the property upon

31

only finding of the value of the collateral securing GPIF's claim for the purpose of ruling on Aspen Club's motion to approve the DIP Loan. The Bankruptcy Court found that "for purposes of [the debtor-in-possession financing] motion and this motion only, and based upon the evidence and the testimony, I would [find] the property *is worth no less than* the ninety to one-hundred-million-dollar range in an as-is condition. ".[99] The Bankruptcy Court did not determine the value of the collateral for purposes of the Exit Financing Motion, § 506, or plan confirmation.[100] The Court's valuation is not binding for those purposes.[101] Absent valuation of the collateral securing GPIF's claim, it is impossible for this Court to determine whether, as a matter of law based on facts established below, GPIF will realize the indubitable equivalent of its claim under the Plan.[102]

---

completion of each phase. 80 B.R. at 175. The court primarily relied on valuation evidence, a purely factual question. *See also In re LightSquared Inc.*, 513 B.R. 56, 98-99 (Bankr. S.D.N.Y. 2014) (where asset's valuation did not support plan's treatment of secured claim, creditor would not realize the indubitable equivalent of its claim).

[99] *Tr. of June 20, 2019 Hearing* at 33, *in* Appellant's App. at 1836 (emphasis added).

[100] Section 364(d)(1)(B) requires the bankruptcy court to find "there is adequate protection of the interest of the holder of the lien on the property . . . on which such senior . . . lien is proposed to be granted."

[101] Federal Rule of Bankruptcy Procedure 3012(a) requires a request for valuation be specifically made on notice to the holder of a secured or priority claim.

[102] There are other variables that could influence whether the Plan provides GPIF with the indubitable equivalent of its claim, including, but not limited to: 1) the current value of the Property; 2) the payoff of prior liens from exit loan proceeds; 3) the amount of loan advances required to complete units for sale; 4) how completion and sales of units will be staged; 5) the value of the units today, as construction progresses, and as completed; 6) the continuum of values of the Property if and when construction were to halt because of a default on the exit loan; 7) construction and other risks; and 8) the tiered payment of the exit loan and to GPIF under the terms of the exit loan commitment and the Plan.

## IV.    Conclusion

Where issues ultimately depend upon factual findings and conclusions drawn from those findings, an appeal must be remanded to the trial court.[103] Accordingly, we must remand to the Bankruptcy Court for findings of fact and conclusions of law on the issue of whether there is a reasonable possibility that the Plan provides GPIF with the indubitable equivalent of its claim such that the Plan has a reasonable possibility of confirmation within a reasonable time. The "reasonable possibility" determination does not require a mini-confirmation hearing. The quantum of evidence required to establish a reasonable possibility that the Plan provides GPIF with the indubitable equivalent of its claim falls far short of the quantum of evidence required to prove, in a confirmation hearing, that the plan satisfies the indubitable equivalent requirement. Yet, this determination must be made in order to determine whether some form of relief from the automatic stay must be granted under the SARE stay relief standard. The Bankruptcy Court's Judgment denying GPIF's Stay Relief Motion is reversed and remanded.

---

[103]    *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1331 (10th Cir. 2010) (remanding where inquiry depends on factual findings and conclusions) (citing *Miller v. Hedlund*, 813 F.2d 1344, 1352 (9th Cir. 1987))).

**MICHAEL**, Bankruptcy Judge, dissenting:

The central issue in this appeal is whether the Bankruptcy Court erred in deferring issues relating to plan confirmation to the evidentiary hearing on confirmation. The majority says yes, on the basis that § 362(d)(3)(A) requires the Bankruptcy Court to find that "the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time[.]"[104] The Bankruptcy Court acted reasonably and prudently to manage a contentious chapter 11 case and move towards confirmation while protecting the interests of all involved. That is what we do. It represents the epitome of judicial discretion. I would affirm the decision of the Bankruptcy Court.

The majority has ruled that, as a matter of law, Aspen Club is not entitled to seek financing under § 364 when that financing will be used to implement a chapter 11 plan (which shall hereafter be referred to as "the § 364 issue"). As the majority notes, the Bankruptcy Court found that the § 364 issue has not been addressed in the Tenth Circuit. Moreover, there appear to be no cases on the issue at the circuit level anywhere. The Bankruptcy Court, noting that the issue is unsettled, deferred ruling on the issue until it held hearings on the Exit Financing Motion and plan confirmation. To paraphrase, the Bankruptcy Court ruled "the § 364 issue is unsettled in this circuit. The issue has been raised in the Exit Financing Motion and as a plan confirmation issue. I choose to address the issue in those hearings, when the record and the law are fully developed, rather than in the scope of an expedited hearing on relief from stay. Given the unsettled nature of

---

[104]    11 U.S.C.A. § 362(d)(3)(A).

the law, there is a reasonable possibility that the plan could be confirmed. The motion for relief is denied. Let's get on with the confirmation hearing."[105] The majority claims this approach is wrong. I disagree.

The majority contends it was error for the Bankruptcy Court to assume that Aspen Club had a reasonable possibility of prevailing on an admittedly unsettled area of law, and that § 362(d)(3)(A) required the Bankruptcy Court to definitively rule on the § 364 issue as part of the motion for relief. The test under § 362(d)(3)(A) is not nearly as stringent as the majority suggests. For example, in *In re Windwood Heights, Inc.*,[106] the bankruptcy court, on facts remarkable similar to the case at bar, held that the test under § 362(d)(3)(A) "is nearly identical to the standard for determining whether or not property is 'necessary for an effective reorganization' in § 362(d)(2)(B),"[107] and went on to hold that "[i]mportantly, adjudicating a relief from stay motion under § 362(d)(3)(A) is *not* to be a mini confirmation hearing."[108] The United States Bankruptcy Court for the District of Kansas has explained the standard in these words:

> The precursor of § 362(d)(3)'s language is found in the Supreme Court's 1988 *Timbers* case in which the court held that in order to defeat a stay relief motion predicated on the debtor's property not being necessary to an

---

[105] There is no argument that GPIF faces economic harm prior to confirmation. The Bankruptcy Court, on the basis of the evidence presented to it, found that GPIF was significantly oversecured. Indeed, in its Stay Relief Motion, GPIF advised the Bankruptcy Court that it had a "stalking bidder" ready, willing, and able to pay $70,000,000 for the property at issue, an amount that would have provided sufficient funds to pay its claim in full. Appellant's App. at 922. GPIF did not seek relief on the basis that it was not adequately protected or make any arguments to the effect that its interests in its collateral were at risk prior to confirmation.

[106] 385 B.R. 832 (Bankr. N.D.W. Va. 2008).

[107] *Id.* at 837-38 (citation omitted).

[108] *Id.* at 838 (citation omitted) (emphasis added).

effective reorganization under § 362(d)(2)(B), the debtor had to demonstrate that there "must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" While a hearing on a (d)(3) motion should not be a mini confirmation hearing, the debtor must show some reasonable possibility of confirming a plan. As one court has artfully stated, "the terms ... 'reasonable possibility' within a 'reasonable time' are rather vague and hopeful terms that require a far lower standard of proof than what will be required of the Debtor [at the confirmation hearing]." Thus, the Court should not expose the debtor to the same level of scrutiny that it will endure if its plan makes it to confirmation, but the Court does require that debtor demonstrate that its plan has "a realistic chance of being confirmed [and] is not patently unconfirmable."[109]

In *RIM Development*, Judge Nugent granted the motion for relief from the automatic stay under § 362(d)(3), finding that the debtor failed to demonstrate that the plan before the court had a reasonable possibility of confirmation. He did so on the basis that the plan was not proposed in good faith, was not feasible as a matter of fact, and failed to meet the cramdown requirements of § 1129(b)(2)(A) and (B).[110] Judge Nugent also noted that the plan presently before him was the debtor's *third* plan, and that, with each successive plan, creditors received a lesser treatment.[111]

In this case, Aspen Club is seeking confirmation of its first plan. There is no evidence of bad faith or economic impossibility, and Aspen Club advances a theory of law that is colorable and unsettled in the Tenth Circuit. Implicit in the Bankruptcy Court's denial of the motion for relief is a finding that Aspen Club met the standards of § 362(d)(3)(A) by making a good faith argument in its favor on the § 364 issue. The

---

[109] *In re RIM Dev., LLC*, 448 B.R. 280, 288-89 (Bankr. D. Kan. 2010) (Nugent, J.) (footnotes and citations omitted).
[110] *Id.* at 289.
[111] *Id.*

decision to deny relief and proceed to confirmation was not an abuse of discretion and

should be affirmed.

As it found error, the majority makes this statement

Although the Bankruptcy Court acted within its discretion in deciding to defer any ruling on the Exit Financing Motion, to determine whether the Plan had a reasonable possibility of being confirmed within a reasonable time the Bankruptcy Court was required under the SARE stay relief standard to decide whether Aspen Club had a reasonable possibility of obtaining court approval of the exit financing, without which the Plan would fail. The Bankruptcy Court abused its discretion in denying the Stay Relief Motion because it did not determine whether the exit financing priming lien component in the Plan prevented Aspen from confirming a plan within a reasonable time.[112]

This pronouncement is puzzling. The paragraph begins with the statement that the

Bankruptcy Court acted within its discretion in deferring its ruling on the Exit Financing

Motion, which is the same as saying the Bankruptcy Court acted within its bounds in

deferring ruling on the § 364 issue. *In the next sentence*, the majority says it was error to

defer consideration of the § 364 issue. What the left hand giveth, the right hand taketh

away.[113]

---

[112]    Majority Opinion at 18 (footnote omitted).

[113]    The majority position is even more puzzling when one considers that a motions panel of this Court, of which the author of the majority opinion was a member, issued an order finding that the issues relating to the Exit Financing Motion were not ripe for appeal. Consider the following excerpt from the order denying review:

The bankruptcy court initially determined it would issue a bifurcated ruling on the motion to approve exit financing to consider whether, as a matter of law, the court has authority to approve post-confirmation exit financing that would prime existing secured creditors. However, instead, the bankruptcy court decided it would defer ruling on the issue. Nor has the bankruptcy ruled on the adequate protection exit financing issue. Because the bankruptcy court has not yet ruled on the exit financing issues

37

The United States Court of Appeals for the Tenth Circuit, in an opinion relied upon the majority, has instructed us that "we must address any alternative ground for affirmance that appellees have properly preserved below and raised on appeal and for which there is a sufficient record."[114] Even if the majority feels the Bankruptcy Court did not meet the standard required under § 362(d)(3)(A), a conclusion with which I would not agree, there is an ample factual record and basis in law to affirm the decision of the Bankruptcy Court. Moreover, if we are going to consider an issue not decided by the Bankruptcy Court, the Tenth Circuit instructs us that we should peruse the record with an eye towards affirmance, not reversal.

The majority, while noting that they "could end the discussion here" and remand the matter to the Bankruptcy Court to consider the § 364 issue, choose to press on, deciding the § 364 issue as a matter of first impression

---

for which the Appellant seeks leave to appeal, the issues are not ripe for appellate review. Accordingly, an immediate appeal of the issues will not materially advance the ultimate termination of the litigation. Dismissal of the appeal of the Financing Order is without prejudice to the Appellant's right to file a notice of appeal after a final order is entered.

*Order Regarding Jurisdiction and Motion for Leave to Appeal*, BAP ECF No. 29. The decision of the motions panel is irreconcilably at odds with the majority decision. It is also correct. As discussed *infra*, the majority decision hinders, rather than advances, the litigation.

[114]    *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273 (10th Cir. 2000) (citation omitted); *accord, Richison v. Ernest Grp., Inc.* 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal.") (citing, among other cases, *S.E.C. v. Chenery Corp.,* 318 U.S. 80, 88(1943) ("[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason.") (internal quotation omitted)).

because the parties extensively argued and briefed the exit financing priming lien issues to the Bankruptcy Court and on appeal, the issues for us to decide are questions of law, the issues impact plan confirmation, and plan confirmation potentially could moot a later appeal of whether exit priming lien financing is permitted under § 364, §§ 1123 and 1129, or both, we exercise our discretion to consider those issues.[115]

This exercise of discretion constitutes abuse. The majority effectively denies the Exit Financing Motion and attempts to decide the issue of plan confirmation, or, at a minimum, to steer the course of confirmation proceedings along a path of their choosing. They take an issue of first impression in the circuit and make it their own. One is left to ponder why the majority feels compelled to foreclose the province of the Bankruptcy Judge to decide his case. If, as the above quote suggests, it is out of fear of the § 364 issue becoming moot, and the labors of the majority being lost to posterity, the reason does not justify the hostile takeover of the province of the trial court. Every trial judge has undertaken significant preparation for a trial only to see the case settle, and every appellate judge has seen a case settle after the matter has been submitted to the court for decision. This is a day-to-day part of American jurisprudence. The potential for mootness does not justify the majority's foray into areas of law yet to be considered by the Bankruptcy Court.

Nor do the cases the majority relies upon.[116] Quite the opposite. In *Singleton v. Wulff*,[117] relied upon by the majority for the proposition that matters may be taken up for the first time on appeal when failure to do so will result in an "injustice," the United

---

[115]    Majority Opinion at 19 (footnotes omitted).
[116]    *See* Majority Opinion at 19 n. 62.
[117]    428 U.S. 106 (1976).

States Supreme Court *reversed* the Court of Appeals for considering on appeal an issue that had never been ruled on by the Supreme Court.[118] The majority identifies no injustice that will result from leaving the Bankruptcy Court with a blank slate upon which to decide the § 364 and plan confirmation issues before it. I respectfully submit the invasion of the province of the Bankruptcy Court by the majority is the only injustice taking place in this case.

The decision of the United States Court of Appeals for the Seventh Circuit to reach an issue not reached by the trial court in the second case relied on by the majority, *AAR International, Inc. v. Nimelias Enterprises S.A.*,[119] is premised upon a determination that "resolution of the issue is clear."[120] The issue of securing financing under § 364 prior to plan confirmation to be utilized as part of a chapter 11 plan is an issue of first impression in the Tenth Circuit; it can hardly be said to be an issue whose resolution is clear, even if two bankruptcy judges in this circuit agree on what the rule should be.[121] Similarly, the Tenth Circuit decision relied upon by my colleagues, *Proctor*

---

[118]     *Id.* at 121 ("Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where 'injustice might otherwise result.' Suffice it to say that this is not such a case. The issue resolved by the Court of Appeals have never been passed upon in any decision of this Court. This being so, injustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard.") (footnote and citations omitted).

[119]     250 F.3d 510 (7th Cir. 2001).

[120]     *Id.* at 523.

[121]     This judge also has an opinion on the § 364 issue, which shall be reserved until the issue is presented to him as a trial court judge or is properly before the Bankruptcy Appellate Panel of the Tenth Circuit in a case assigned to him as a panel member.

*& Gamble Co. v. Haugen,*[122] limits appellate review of issues not decided by the trial court to those cases where proper resolution of the issue "is certain."[123] Neither case supports the action taken by the majority today. This judge was unable to find a single case where a Bankruptcy Appellate Panel decided an issue of first impression in a circuit when that issue had not been ruled upon by the bankruptcy court as part of the decision appealed from.[124]

In support of their position that § 364 may not be used to obtain financing that survives plan confirmation, the majority rely primarily on *In re SAI Holdings, Ltd.,*[125] *In re Les Ruggles & Sons, Inc.,*[126]and *In re Hickey Properties, Ltd.,*[127] finding those cases "persuasive."[128] The majority apparently believes the matter is cut and dried, or, in the vernacular of the Tenth Circuit, "certain." While the majority has the right to be persuaded by these cases, the suggestion that they are controlling or render their conclusion "certain" is incorrect.

---

[122]     222 F.3d 1262 (10th Cir. 2000).
[123]     *Id.* at 1271.
[124]     In response to the dissent, the majority has chosen to ignore the guidance of the Tenth Circuit, cite the language of the § 362(d)(3)(A) (and nothing more) and argue that their action in deciding the § 364 issue reflects congressional intent. Majority Opinion at 20. Even if Congress intended to micromanage a bankruptcy court's docket (a notion to which I do not ascribe), it did not instruct any appellate court to do so. At most, the argument advanced by the majority justifies remand. It does not justify ignoring the direction given by the United States Court of Appeals for the Tenth Circuit.
[125]     No. 06-33227, 2012 WL 3201893 (Bankr. N.D. Ohio Aug. 3, 2012).
[126]     222 B.R. 344 (Bankr. D. Neb. 1998).
[127]     181 B.R. 173 (Bankr. D. Vt. 1995).
[128]     Majority Opinion at 25.

In their opposition to the Stay Relief Motion, counsel for Aspen Club effectively disposed of the cases relied upon by the majority. Rather than reinvent the wheel, counsel's words bear repeating:

> To support its contention the Debtors' request under § 364(d) is impermissible, GPIF cites several cases it believes establish a "bright-line rule" against the proposed exit financing. First, none of these cases – *In re Hickey Props., Ltd.*, 181 B.R. 173 (Bankr. D. Vt. 1995); *In re Les Ruggles & Sons*, 222 B.R. 344 (Bankr. D. Neb. 1998); *In re SAI Holdings, Ltd.*, 2012 Bankr. LEXIS 3601 (Bankr. N.D. Ohio Aug. 3, 2012); and *In re City of Detroit*, 524 B.R. 174 (Bankr. E.D. Mich. 2014) – are decisions from within this District or even within this Circuit. Thus, these decisions are neither controlling nor binding upon this Court, *see In re 1075 S. Yukon, LLC*, 590 B.R. 527, 533 (Bankr. D. Colo. 2018) (Court was not bound by decisions by bankruptcy courts from outside this District), and a cursory examination of those cases reveals each one merely relies upon the others in support of their rulings and no other outside decisions.[129]

Moreover, counsel for Aspen Club noted several factual differences between the cases relied upon by the majority and GPIF and the case at bar:

> [I]n *In re Les Ruggles & Sons, Inc.*, the debtor sought to obtain post-petition financing under § 364(d) *three months after* the court confirmed the debtor's plan. *See In re Les Ruggles & Sons, Inc.*, Case No. 97-40779-TJM, ECF Nos. 81, 90. The *Ruggles* court concluded the confirmed plan was binding upon the parties, and the first priority lien retained by the secured creditor under the terms of the plan could not be impaired by § 364(d)(4) post-confirmation. *In re Les Ruggles & Sons, Inc.*, 222 B.R. at 345 (citing *In re Hickey Props., Ltd.*, 181 B.R. at 174). However, the court also stated that while subordination of the secured creditor's claim would be contrary to the express terms of the already confirmed plan, the new lender could be granted a priming lien senior to that of the secured creditor if the plan had provided for such subordination. *Id.*[130]

They were equally adroit in their disposal of *SAI Holdings*:

---

[129]    *Objection to GPIF's Motion for Relief From the Automatic Stay Pursuant to the SARE Provisions of 11 U.S.C. § 362(d)(3)* at 4, *in* Appellant's App. at 1251.
[130]    *Id.*

In *In re SAI Holdings*, another case cited by GPIF, prior to confirmation of the debtor's plan, the bankruptcy court authorized post-petition financing secured by priming liens pursuant to § 364(c) and (d). *In re SAI Holdings, Ltd.*, 2012 Bankr. LEXIS 3601 at *20. After confirmation of the plan, a creditor challenged whether certain post-confirmation loan advances – not authorized by the pre-confirmation orders – were either secured or entitled to superpriority claim status. *Id*. The bankruptcy court agreed that while § 364(d) did not apply on a post-confirmation basis [because] the confirmation order expressly provided the pre-confirmation priming liens granted under § 364(c) and (d) survived confirmation. *Id*. The court, citing *Ruggles*, reasoned § 364(c) and (d) only refer to obtaining credit by a trustee or a debtor-in-possession and incurring debt secured by a lien on "property of the estate," none of which legally exist post-confirmation. *Id*. at *21. However, while the court held the pre-confirmation orders granting liens under § 364(c) and (d) did not authorize the post-confirmation secured borrowings, it found the terms of the confirmed plan permitted the liquidating trustee to borrow funds on a secured basis as necessary or advisable to effectuate the terms of the liquidating trust. *Id*. at *22-23. Thus, nothing in *SAI Holdings* precludes the terms of the Plan permitting the Reorganized Debtors to obtain proceeds of the Exit Financing Agreement post-confirmation on a secured basis.[131]

The *Hickey Properties* case is the case most closely aligned with the facts at bar. It contains little analysis, is not binding in this circuit, and appears to have been cited for the proposition advanced by the majority three times in twenty-five years.

The existence of *Les Ruggles, SAI Holdings,* and *Hickey Properties* does not render the majority's reading of the law a certainty. The cases do little more than play a game of judicial "telephone" where one case cites another, and so on, and so on. It is true that these cases contain very attractive "sound bites" that can be used to support the arguments made by the majority. The use of "sound bites" is a dangerous practice when

---

[131]     *Objection to GPIF's Motion for Relief From the Automatic Stay Pursuant to the SARE Provisions of 11 U.S.C. § 362(d)(3)* at 5, *in* Appellant's App. at 1252.

engaged in by counsel; it is a far more precarious thing when undertaken by judicial officers.[132]

Even if one assumes that the Bankruptcy Court was required to decide the § 364 issue as part of its ruling on the Stay Relief Motion and that reversal is appropriate, the majority's foray into the § 364 issue and other issues related to confirmation opens a Pandora's box. As the majority correctly notes, the Bankruptcy Court has commenced the hearings on confirmation and the Exit Financing Motion. At this point, we risk throwing a wrench in that process that will not promote the "just, speedy, and inexpensive determination"[133] of this case, but instead creates the likelihood of inconsistent rulings, confusion, and delay.[134] All of this could be avoided if the majority

---

[132]    This judge has disparaged the use of "sound bites" for more than twenty years:

Know the facts of the cases you cite.  At the writing of this little ditty, there are almost 300 volumes of West's Bankruptcy Reporter.  Suffice it to say that some judge, somewhere, sometime has written and published an opinion which contains the magic words which support your position.  It is extremely tempting to insert that quotation (I call them "sound bites") into your brief and say, "see, judge, other courts agree with me so I must be right."  This is a dangerous practice.  Courts decide real disputes.  Real disputes are fact driven.  For me, the facts of a case are at least as important as the legal analysis.  Be wary of the case which is factually dissimilar to yours but has a great sound bite.  Be sure (either in your brief or at oral argument) to explain why the factually dissimilar case is applicable to your situation.  Also, be cognizant of the difference between the holding of a case and the dicta contained therein.  Most judges (this one included) find little value in dicta unless we already agree with it.

Ten Tips For Effective Brief Writing (at least with respect to briefs submitted to Judge Michael), https://www.oknb.uscourts.gov/sites/oknb/files/briefwritingtips.pdf.
[133]    See Fed. R. Bankr. P. 1001.
[134]    The Bankruptcy Court may well rule on one or more issues the majority has unnecessarily reached before this opinion is issued. If that happens, what is the

44

would limit their decision to a remand requiring the Bankruptcy Court to decide the § 362(d)(3)(A) issue, instead of telling it how to do it.

**Conclusion**

The majority contends it is an abuse of discretion for a bankruptcy judge to refuse to rule on unsettled areas of law on an expedited basis. Even if the majority is correct, a Bankruptcy Appellate Panel should be loath to decide unsettled issues of law as a matter of first impression, rather than remanding them to the bankruptcy court for initial consideration. For that reason, and because I believe the Bankruptcy Court acted well within its discretion in denying the Stay Relief Motion, and because appellate courts should be careful not to strip a bankruptcy court of the discretion necessary to perform its duties, I respectfully and vehemently dissent.

---

effect of the majority opinion? Is it the law of the case, binding the Bankruptcy Court to its conclusions? Is it an advisory opinion? Must the Bankruptcy Court start its hearings anew, given that neither the Bankruptcy Court nor the parties were aware of the majority's decision when they framed their issues, identified their exhibits, and selected and prepared their witnesses? What if this decision is appealed further? Does a subsequent appeal preclude the Bankruptcy Court from considering any and all issues related to this appeal? Unnecessary mousetraps, one and all.